JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.
**535 In this case, police officers responded to a noise complaint at a motel room and determined not to issue a summons when the renter of the room immediately complied with their request to turn down the music. The police nevertheless conducted an investigatory detention on a group of ten people and ran warrant checks on them. More than twenty minutes into the detention, police arrested Deyvon Chisum for an outstanding warrant and discovered a concealed firearm on him. They then conducted pat-down searches on the remaining occupants and found a firearm on defendant Keshown Woodard.
The trial court denied defendants' motions to suppress the firearms. The trial court determined that the police entered the motel room lawfully, Chisum was properly arrested because he had an outstanding warrant, and the seizure of the firearm he possessed was obtained through a lawful *1282 search incident to arrest. The trial court also found that the police were justified in conducting pat-down searches of the remaining occupants in the room for the officers' safety. The Appellate Division affirmed.
We disagree with those findings. Once the renter of the motel room lowered the volume of the music and the police declined to issue summonses, the police no longer had any reasonable suspicion that would justify the continued detention of the room's occupants. Once the noise was abated, the police no longer had an independent basis to detain the occupants, or a basis to run warrant checks on them. Such action was unlawful. And because the detention and warrant checks were unlawful, the subsequent pat-down of Woodard was also improper.
**536 Therefore, we reverse the judgment of the Appellate Division and remand to the trial court for the withdrawal of defendants' guilty pleas and further proceedings consistent with this opinion.
I.
A.
Shortly before midnight on February 7, 2014, two Neptune police officers, Officer Harris and Officer Sibole, were dispatched to the Crystal Inn Motel to investigate a noise complaint. The noise complaint came from the occupant of Room 223, who stated that people in a nearby room were playing loud music and speaking in loud voices. Officer Harris was familiar with the Crystal Inn Motel based on prior calls to the motel and the motel's reputation as a site where criminal activity took place. Officer Harris testified that the motel "was a spot that officers generally patrolled because there was various narcotics distribution there, as well as calls for homicides, robberies, [and] burglaries."
Upon arriving at the Crystal Inn Motel, the officers made their way down the hallway on the first floor toward the stairs to the second floor. On the way, the officers could hear the music and voices upstairs. As they approached Room 223, the emanating noise increased. At that point, the occupant of Room 223 came out to the hallway and identified himself as the complainant. The complainant stated that the disturbance was coming from the next-door suite, Room 221. Officer Harris could also hear "loud music" and "multiple voices" coming from inside Room 221 from his position in the hallway.
Because of the reputation of the Crystal Inn Motel and the sound of multiple voices coming from inside Room 221, the officers called for back-up as a safety precaution. While waiting for back-up, the officers observed a man open the door to Room 221 and enter the hallway where the officers were standing. As soon as the man saw the officers in the hallway, he turned around and re-entered **537 Room 221. Before the door closed, Officer Sibole wedged his foot into the doorway, keeping the door partially open.
The officers remained in the hallway at the threshold of the door to Room 221. Officer Harris identified himself as a police officer and informed the occupants that the police were there in response to a noise complaint. From his vantage point, Officer Harris could see "about ten people" in the room. Officer Harris then asked to speak to the renter of the room, at which time Zykia Reevey identified herself as that person. She apologized for the noise and invited the officers inside. Around that time, three back-up officers arrived. Officer Harris, Officer Sibole, and one of the back-up officers entered the room, while the two other officers remained in the hallway as a safety precaution. Officer Harris spoke to Reevey, who lowered the *1283 volume of the music at the officer's request.
The officers then asked Reevey and the other occupants of the room for their identification. All of the occupants provided either a form of identification or, in the case of Chisum and one of the female occupants, identifying information such as a name and date of birth. The officers relayed the occupants' information to dispatch to check for outstanding warrants. Officer Harris stated that the occupants of the room were not allowed to leave until the results of their individual warrant checks came back. The occupants were released from the scene on an individual basis, as each was cleared by the dispatcher.
Officer Harris did not issue any noise violation summons. He testified that the "investigation was complete when [Reevey] agreed to turn the noise down and [he] decided not to give her a summons for the ordinance violation." When asked, however, why he and the other officers did not leave once Reevey turned the music down, Officer Harris testified that "as a police officer ... we want to identify who's in a room or at least get the renter's name." Harris explained that it is standard police practice to obtain a person's identification in the course of issuing a summons for violation of a noise ordinance. According to Officer Harris, one **538 of the reasons that identification is obtained in cases like this one is in the event of a callback to that location. Officer Harris further testified that the issuance of a summons for a noise complaint is discretionary and that warrant checks are performed "for any call of service."
The warrant checks were run through the County dispatch system. According to the information entered into the computer-aided dispatch (CAD) report by the dispatcher, the officers detained the occupants for a total of about twenty minutes while awaiting the results of the warrant checks.
Woodard was the first occupant for whom the officer called in a warrant check, at 12:11 a.m. Chisum was the fourth occupant of the room whose information was relayed to the dispatcher, which occurred at 12:14 a.m. The results of the warrant checks began to come back at 12:21 a.m. At least three individuals were released following the results of their warrant checks. According to the CAD report, Woodard was cleared at 12:23 a.m. Woodard, however, either chose to stay on the premises or was not released.[1] Dispatch then revealed that a female in the room provided the officers with a false name and that she had an outstanding warrant; she was detained. The warrant check for Chisum came back positive for warrants at 12:32 a.m., and he was placed under arrest.
After handcuffing Chisum and escorting him into the hallway, Officer Harris conducted a search incident to arrest and patted Chisum down for weapons, revealing a handgun tucked into his waistband. The handgun was retrieved, and Chisum was secured **539 in the hallway. Officer Harris ordered the remaining occupants in Room 221 to place their hands above their heads and informed them that they would all be patted down for weapons. The pat-down *1284 of Woodard revealed that he also possessed a handgun. The handgun was seized, and Woodard was placed under arrest.
B.
A Monmouth County grand jury issued an indictment charging Chisum with second-degree unlawful possession of a weapon, contrary to N.J.S.A. 2C:39-5(b) (count one), and fourth-degree possession of a prohibited weapon, contrary to N.J.S.A. 2C:39-3(d) (count two); Woodard was charged with second-degree unlawful possession of a weapon, contrary to N.J.S.A. 2C:39-5(b) (count three).
The trial court denied defendants' motions to suppress the evidence. The trial court held that recovery of the firearm from Chisum's waistband was lawfully conducted as a search incident to a lawful arrest and therefore suppression of the handgun was not warranted. Regarding the protective frisk of Woodard, the trial court observed that the Crystal Inn Motel was known to the officers dispatched in this case as a location where numerous crimes took place, including homicides, robberies, and burglaries. Based on the totality of the circumstances -- including the officers' experience, the reputation of the Crystal Inn Motel, and the handgun found on Chisum's person -- the court concluded that a reasonably prudent person would have felt that his or her safety was at risk. The court therefore declined to suppress the firearm found on Woodard, finding the protective frisk warranted.
Chisum pled guilty to count one of the indictment. The State dismissed count two of the indictment and recommended a five-year term of imprisonment with three-and-a-half years of parole ineligibility. Woodard pled guilty to count three and to third-degree possession of a controlled dangerous substance (CDS) arising from an unrelated indictment. The State recommended a five-year term of imprisonment with three-and-a-half years of **540 parole ineligibility on the gun charge and a concurrent three-year term of imprisonment on the CDS charge.[2] The trial court sentenced defendants in accordance with the State's recommendations.
The Appellate Division panel affirmed the denial of defendants' motions to suppress in a consolidated opinion. The panel first concluded that the initiation of the investigative detention was justified by the officers' observation that the occupants were violating the noise ordinance. The panel explained that "[t]he occupants [of the room] were all listening to the loud music and, whether directly responsible for setting the volume at a high level or acquiescing in that level of noise, all ten of the occupants, not just Reevey, could have been charged with violating the noise ordinance." The panel credited Officer Harris's testimony that "the identity of all participants involved in a noise complaint must be ascertained in case there is a callback." The panel held that "[a]lthough the police exercised their discretion in issuing only a warning, the police articulated a legitimate basis for ascertaining the identity of all present."
The panel also held that the warrant checks were permissible. The panel emphasized that "the correct identities of ten individuals had to be ascertained" and that some of the occupants, including Chisum, failed to produce formal identification. According to the Appellate Division, until the identity of every individual could be verified, and warrant checks could be run on *1285 them, the purpose of the police officers' stop was not complete. The panel further found that the police acted diligently and stressed that they released the detainees as soon as their warrant checks came back negative. The panel concluded that extending the duration of the detention to run background checks upon all present constituted a very minimal additional intrusion upon the defendants' privacy. **541 Balanced against the police officers' need to complete their mission, the panel determined that the detention was not unreasonably prolonged.
The panel also held that the pat-down of Woodard was lawful because the officers had an objectively reasonable suspicion that their safety was in danger, based on the reputation of the Crystal Inn Motel, the recovery of the handgun from Chisum, the number of unrestrained persons in the motel room, and the fact that at least one occupant had provided a false name to police.
We granted defendants' petitions for certification "limited to the issues of whether the police were authorized to detain the defendants and to conduct pat-down searches for weapons." 232 N.J. 88, 178 A.3d 62 (2018). We also granted the motions of the Attorney General of New Jersey and the American Civil Liberties Union of New Jersey (ACLU) to participate as amici curiae.
II.
A.
In Chisum's view, the officers' authority flowed from -- and was therefore limited by -- the noise complaint: when the officers determined not to issue summonses after abatement of the noise, that decision extinguished any reasonable suspicion allowing officers to lawfully detain the occupants of the room to check for warrants. Chisum contends that the warrant check unreasonably prolonged the investigatory stop because nothing the police officers could have learned during the warrant check would confirm or dispel any issues concerning the noise complaint. Chisum also asserts that there was no reason why the identities of the occupants of the room had to be ascertained in anticipation of a callback, adding that the possibility of a future violation is an inadequate justification for a Terry [3] stop. The detention of all ten occupants in the room, according to Chisum, went far beyond what **542 a reasonable law enforcement response would have been for a noise complaint.
B.
Woodard advances many of the same arguments that Chisum raises regarding the unlawfulness of the prolonged detention. Woodard further contends that the protective frisk was unconstitutional in the absence of any particularized suspicion that he possessed a weapon or posed a safety risk to the officers. Woodard argues that the protective frisk was based on nothing more than his physical proximity to someone who possessed a firearm, not on a reasonable suspicion that he was dangerous, contrary to established law. Woodard notes that he was cooperative, produced valid identification when asked, did not make any suspicious movements, remained in plain view of the officers, and gave no outward indication that he and Chisum had some joint purpose.
C.
The ACLU submits that, absent any objective basis to suspect criminal activity, the officers could not continue to detain *1286 the occupants of the motel room following the completion of the noise investigation. The ACLU maintains that the State does not claim there was any reasonable suspicion of criminal activity specific to Chisum or Woodard existing prior to police entry into the motel room, or upon entry. The ACLU also submits that, in this instance, the practice of running warrant checks is not valid just because it is standard procedure for members of the Neptune police.
Turning to the pat-down of Woodard, the ACLU submits that a police officer's suspicion that an individual is armed and dangerous must be based on specific facts and that Woodard's mere association with, or proximity to, someone who possessed weapons or contraband, without more, is insufficient. The ACLU argues that the pat-down was the result of an impermissible assumption of Woodard's guilt or suspicion by association.
**543 D.
The State submits that the performance of the warrant checks were a lawful and appropriate part of their investigation into the noise ordinance complaint. According to the State, the relevant noise ordinance applied to all occupants in the room, not exclusively to the renter. The State asserts that the officers had the requisite reasonable suspicion to detain the occupants of the motel room based on the noise complaint and what the officers observed from the hallway. The State submits that within the mission of any investigative detention is obtaining the identity of the suspect(s) in order to determine whether there are any outstanding warrants. Two rationales support that proposition: officer safety and the government's interest in bringing criminals to justice. Further, the State submits that Reevey's compliance with the officers' request to abate the noise did not terminate either the officers' reasonable suspicion related to the noise ordinance violations or the need for the officers to immediately end the detention of the motel room occupants.
As to the frisk of Woodard, the State asserts that the totality of the circumstances, including the motel's reputation for criminal activity, the time of night, and the fact that the officers were outnumbered by the remaining occupants in the room, suggests that the pat-down was proper.
E.
In support of the State's position, the Attorney General, as amicus curiae, asserts that police officers may lawfully request identification and check for warrants during the course of a valid Terry stop because such inquiries " 'are negligibly burdensome precautions' that serve important government interests to complete an officer's mission safely." The Attorney General argues that the investigative detention in this instance was lawful because the officers had reasonable suspicion that the occupants of the motel room were violating the noise ordinance. The Attorney General stresses that because it was within the officers' discretion **544 to issue a warning or ticket for the noise ordinance violation, it would have been reasonable for the officers to run warrant checks prior to determining whether to issue a summons. Moreover, the officers' performance of the warrant checks, according to the Attorney General, "did not prolong the detention beyond its original purpose because it was in fact a part of that mission." According to the Attorney General, "[t]his routine information was needed to decide whether to issue warnings or summonses for the noise-ordinance violation, to record who was present in the event officers needed to return for another complaint, and to inform *1287 the officers if anyone posed a threat of danger."
The Attorney General endorses the police department's policy of requesting warrant checks during any call for service and contends that police officers should not be criticized or penalized for taking reasonable safety-driven precautions like the officers did in this instance. The Attorney General adds that the safety of the officers was of particular concern in this case.
Regarding the recovery of the firearms from Chisum and Woodard, the Attorney General asserts that Chisum was lawfully searched incident to his arrest and that Woodard was subject to a valid protective frisk for weapons because it was objectively reasonable for the officers to frisk the remaining occupants of the room for weapons as a safety precaution.
III.
A.
The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution both provide that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV ; N.J. Const. art. I, ¶ 7. "Those provisions impose a standard of reasonableness on the exercise of discretion by government officials to protect persons against arbitrary invasions."
**545 State v. Maristany, 133 N.J. 299, 304, 627 A.2d 1066 (1993). "People, generally, are free to go on their way without interference from the government. That is, after all, the essence of the Fourth Amendment -- the police may not randomly stop and detain persons without particularized suspicion." State v. Shaw, 213 N.J. 398, 409, 64 A.3d 499 (2012) ; see Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
Warrantless searches and seizures are "presumptively invalid as contrary to the United States and the New Jersey Constitutions." State v. Pineiro, 181 N.J. 13, 19, 853 A.2d 887 (2004). "Because our constitutional jurisprudence evinces a strong preference for judicially issued warrants, the State bears the burden of proving by a preponderance of the evidence that a warrantless search or seizure falls within one of the few well-delineated exceptions to the warrant requirement." State v. Mann, 203 N.J. 328, 337-38, 2 A.3d 379 (2010) (quoting State v. Elders, 192 N.J. 224, 246, 927 A.2d 1250 (2007) ). One such exception is an investigatory stop of a person. State v. Rodriguez, 172 N.J. 117, 126-27, 796 A.2d 857 (2002).
"[A]n investigative detention, also called a Terry stop or an investigatory stop, occurs during a police encounter when 'an objectively reasonable person' would feel 'that his or her right to move has been restricted.' " State v. Rosario, 229 N.J. 263, 272, 162 A.3d 249 (2017) (quoting Rodriguez, 172 N.J. at 126, 796 A.2d 857 ); see also Terry, 392 U.S. at 16, 88 S.Ct. 1868 ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."). "Because an investigative detention is a temporary seizure that restricts a person's movement, it must be based on an officer's 'reasonable and particularized suspicion ... that an individual has just engaged in, or was about to engage in, criminal activity.' " Rosario, 229 N.J. at 272, 162 A.3d 249 (ellipsis in original) (quoting State v. Stovall, 170 N.J. 346, 356, 788 A.2d 746 (2002) ). An investigative detention is permissible "if it is based on specific and articulable facts which, taken together with rational inferences **546 from those facts, give rise to a reasonable suspicion *1288 of criminal activity." Pineiro, 181 N.J. at 20, 853 A.2d 887 (quoting State v. Nishina, 175 N.J. 502, 510-511, 816 A.2d 153 (2003) ). Conversely, an investigative detention "may not be based on arbitrary police practices, the officer's subjective good faith, or a mere hunch." State v. Coles, 218 N.J. 322, 343, 95 A.3d 136 (2014).
"[I]n determining the lawfulness of an investigatory stop, a reviewing court must 'evaluate the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions.' " State v. Privott, 203 N.J. 16, 25-26, 999 A.2d 415 (2010) (quoting State v. Davis, 104 N.J. 490, 504, 517 A.2d 859 (1986) ). "An investigative detention that is premised on less than reasonable and articulable suspicion is an 'unlawful seizure,' and evidence discovered during the course of an unconstitutional detention is subject to the exclusionary rule." Elders, 192 N.J. at 247, 927 A.2d 1250.
There is "no rigid time limitation on Terry stops." United States v. Sharpe, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). "Case law has recognized law enforcement's need to respond to the fluidity of a street encounter where there is a reasonable suspicion of wrongdoing; accordingly, the duration of the investigative stop may be extended for a reasonable but limited period for investigative purposes." Coles, 218 N.J. at 343-44, 95 A.3d 136. However, an investigatory detention may become too long if it involves a "delay unnecessary to the legitimate investigation of the law enforcement officers." Sharpe, 470 U.S. at 687, 105 S.Ct. 1568. Therefore, a continued detention must also conform to the constitutional requirement of reasonableness. Coles, 218 N.J. at 344, 95 A.3d 136. In Coles we provided guidance on this issue:
The reasonableness of a continued detention is determined through application of a two-pronged inquiry. First, the detention must have been reasonable at its inception. Second, the scope of the continued detention must be reasonably related to **547 the justification for the initial interference. Thus, the detention must be reasonable both at its inception and throughout its entire execution.
[ Ibid. (citations omitted).]
Therefore, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). That is why police officers "must use the least intrusive means necessary to effectuate the purpose of the investigative detention, and the detention must 'last no longer than is necessary to effectuate the purpose of the stop.' " Coles, 218 N.J. at 344, 95 A.3d 136 (citation omitted) (quoting Shaw, 213 N.J. at 411, 64 A.3d 499 ). "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." Rodriguez v. United States, 575 U.S. ----, 135 S.Ct. 1609, 1612, 191 L.Ed.2d 492 (2015).
Our Court has recognized that "[t]here is [no] litmus-paper test for ... determining when a seizure exceeds the bounds of an investigative stop." State v. Dickey, 152 N.J. 468, 476, 706 A.2d 180 (1998) (second alteration and ellipsis in original) (quoting Florida v. Royer, 460 U.S. 491, 506, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) ). Therefore, "[i]n assessing whether a detention is too long in duration to be justified as an investigative *1289 stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Id. at 477, 103 S.Ct. 1319 (quoting Sharpe, 470 U.S. at 686, 105 S.Ct. 1568 ). "Even a stop that lasts no longer than necessary to complete the investigation for which the stop was made may amount to an illegal arrest if the stop is more than 'minimally intrusive.' " Id. at 478, 103 S.Ct. 1319.
B.
"The exclusionary rule 'is a judicially created remedy designed to safeguard' the right of the people to be to be free from **548 'unreasonable searches and seizures.' " State v. Williams, 192 N.J. 1, 14, 926 A.2d 340 (2007) (quoting United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) ). As this Court has opined, the exclusionary rule has a "two-fold purpose." Shaw, 213 N.J. at 413, 64 A.3d 499. One " 'is to deter future unlawful police conduct' by denying the prosecution the spoils of constitutional violations." State v. Badessa, 185 N.J. 303, 310, 885 A.2d 430 (2005) (quoting State v. Evers, 175 N.J. 355, 376, 815 A.2d 432 (2003) ). Under that purpose, "[t]he rule is calculated to prevent, not to repair. Its purpose is to deter -- to compel respect for the constitutional guaranty in the only effectively available way -- by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) (citing Eleuteri v. Richman, 26 N.J. 506, 513, 141 A.2d 46 (1958) ). The second purpose of the exclusionary rule "is to uphold judicial integrity by serving notice that our courts will not provide a forum for evidence procured by unconstitutional means." Williams, 192 N.J. at 14, 926 A.2d 340. "Simply put, the exclusionary rule removes the profit motive for those officials who would violate the Constitution." Shaw, 213 N.J. at 414, 64 A.3d 499. "Because of the high price exacted by suppressing evidence, 'the exclusionary rule is applied to those circumstances where its remedial objectives can best be achieved.' " Ibid. (quoting Williams, 192 N.J. at 15, 926 A.2d 340 ).
IV.
Applying those legal principles to the facts and circumstances of this case, we conclude that the detention of the motel room occupants, including Chisum and Woodard, was unconstitutional.
We disagree with the Appellate Division's view that the totality of the circumstances provided the police officers at the Crystal Inn Motel with an objectively reasonable suspicion that their safety was in danger, and that the correct identities of the ten occupants of the motel room had to be ascertained. After the determination **549 was made not to issue a summons for a noise violation, the police officers' decision to continue their investigation to ascertain the identities of every occupant of the room was misplaced.
We recognize that police officers should consider their surroundings, and that Officer Harris and other members of the Neptune Police Department knew the Crystal Inn Motel was a place where significant criminal activity took place. Nonetheless, the Crystal Inn's reputation as a place where previous criminal activity transpired is unconnected to the circumstances surrounding a noise complaint concerning Room 221 on the night in question. We have recognized that, just because a location to which police officers are dispatched is a high-crime area, "does not mean that the residents in that area have lesser constitutional protection from random stops." Shaw, 213 N.J. at 420, 64 A.3d 499 ; see *1290 Maryland v. Buie, 494 U.S. 325, 334 n.2, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) ("Even in high crime areas, where the possibility that any given individual is armed is significant, Terry requires reasonable, individualized suspicion before a frisk for weapons can be conducted." (emphasis added) ). "[T]he random detention of an individual for the purpose of running a warrant check -- or determining whether the person is wanted on a particular warrant -- cannot be squared with values that inhere in the Fourth Amendment and Article I, Paragraph 7 of our State Constitution." Shaw, 213 N.J. at 421, 64 A.3d 499.
Focusing on the specific facts of this case, the Neptune Police Department dispatched officers to the Crystal Inn Motel to investigate a noise complaint. Thereafter, the police officers identified themselves to the occupants of Room 221 and explained that they were there investigating a noise complaint. The officers then asked to speak to the renter of the room. Zykia Reevey came forward, identified herself as the renter, and invited the officers into Room 221. Reevey explained to the officers that she did not know that the music they were playing was too loud and disturbing others, and she immediately turned the volume of the music down. The police chose not to issue any summonses for the violation of a **550 noise ordinance, and Officer Harris testified that the "investigation was complete when [Reevey] agreed to turn the noise down and [he] decided not to give her a summons for the ordinance violation."
We find that the police officers' decision to continue to detain all ten occupants of the motel room after the ultimate determination was made not to issue any summonses for a noise violation was unconstitutional. The investigative detention in this instance, like all investigatory detentions, required that the officers reasonably and particularly suspected that the occupants in Room 221 engaged in, or were about to engage in, some form of criminal activity. See Terry, 392 U.S. at 16, 88 S.Ct. 1868 ; Rosario, 229 N.J. at 272, 162 A.3d 249 ; Rodriguez, 172 N.J. at 126, 796 A.2d 857. Because the officers exercised their own discretion and declined to issue a summons for a noise violation, they essentially concluded that the occupants of Room 221 were not engaging in any criminal activity. Moreover, there is no evidence in the record that any occupants in Room 221 were about to engage in some form of criminal activity, particularly once the noise was abated and the mission of the noise complaint was completed. Therefore, the police officers in this instance were no longer allowed to detain the occupants of the motel room to conduct further investigation into those occupants. After the loud music was abated and the police chose not to issue a summons, submitting warrant checks was unnecessary and improper because doing so would do nothing to help confirm or undermine the police officers' decision regarding the noise complaint.
Furthermore, as stated above, police officers are required to use the least intrusive means necessary in effectuating the purpose of an investigative detention, and such a detention cannot last any longer than necessary to effectuate the purpose of the stop. See Coles, 218 N.J. at 344, 95 A.3d 136. The police officers in this instance clearly did not use the least intrusive means necessary to carry out their investigative detention, and they exceeded the time **551 necessary to resolve the matter for which the investigative stop was made in the first place.
Although this Court recognizes that police safety is of paramount importance, it is insufficient justification for police officers to detain ten occupants of a motel room and run warrant checks on each of them *1291 simply because citizens violated a noise ordinance and then promptly abated the noise upon police arrival. To hold that a remedied noise violation is sufficient basis to detain citizens in order to run warrant checks would run contrary to this Court's jurisprudence. That is to say, it would be both burdensome and problematic if at every public gathering where a noise complaint was reported, responding police officers would be allowed to detain and run warrant checks on each and every individual in attendance.
Because the investigative detention here was based on less than reasonable suspicion, an unlawful seizure took place contrary to the Fourth Amendment of the United States Constitution and Article I Paragraph 7 of the New Jersey Constitution. The firearm discovered on Chisum in the search incident to arrest is therefore subject to the exclusionary rule. Consequently, the need to pat-down Woodard after finding the firearm on Chisum was also unnecessary, and the firearm found on Woodard is also subject to the exclusionary rule.
V.
We reverse the judgment of the Appellate Division and remand to the trial court to withdraw defendants' guilty pleas and for further proceedings consistent with this opinion.
CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA'S opinion.

There is a dispute in the record regarding the timing of Woodard's warrant check. Officer Harris testified that he had not learned the results of Woodard's warrant check prior to Chisum's positive hit. He averred that it is possible that the CAD report may have been inaccurate because information is not always recorded contemporaneously. The Appellate Division inferred that the trial court reasoned that Woodard would have left as soon as his warrant check was completed and so accepted Officer Harris's explanation that Woodard's warrant check was completed after Chisum's.

The periods of parole ineligibility were required by the Graves Act, N.J.S.A. 2C:43-6(c). Woodard and Chisum received parole on September 17, 2017, and December 29, 2017, respectively.

Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).