**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0379-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

WILSON GEORGE,

     Defendant-Appellant.

_____

Argued September 22, 2021 – Decided November 23, 2021

Before Judges Fuentes, Gooden Brown, and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 17-07-0389.

Zachary Markarian, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Zachary Markarian, of counsel and on the briefs).

William P. Cooper-Daub, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; William P. Cooper-Daub, of counsel and on the brief).

PER CURIAM

After the trial court denied motions to suppress evidence seized in an investigatory stop, defendant Wilson George pleaded guilty to one count of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), was sentenced to a fifteen-year term of imprisonment subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and ordered to pay restitution. Because the trial court did not err in denying the suppression motions or ordering restitution, we affirm.

## I.

We glean the following facts from the record of the suppression hearing.

## A.

On June 11, 2016, Trenton Police Detectives Crystal Everett and Jonathan Cincilla were patrolling in an unmarked white Crown Victoria sedan, well-known in the community as a police vehicle. At approximately 3:45 p.m., they received a dispatch advising police units a shooting was in progress at 5 Prospect Village, a neighborhood on the west side of Trenton. From the dispatch, the detectives understood three suspects were fleeing the area of the shooting. Recorded transmissions did not confirm the detectives' recollection about a broadcast concerning three suspects fleeing from Prospect Village, but not all

2

transmissions are recorded. A CAD[1] report indicated one dispatch contained information that "three . . . young males [had] jumped into a four-door white car and fled up Prospect Street towards Oak . . . ." Neither detective recalled hearing that information.

As members of the Street Crimes Unit, Everett and Cincilla were familiar with Trenton "hot spots," areas with high crime and recent shootings. They knew about an "ongoing feud between gang members of Prospect Village and gang members of North 25," which was a housing project located about a quarter mile from Prospect Village. After receiving the dispatch, Cincilla initially drove in the Prospect Village area, but, hearing other police units responding to Prospect Village, he drove towards North 25 to intercept any potential suspects returning to North 25 from the crime scene.

Approximately one minute after the radio dispatch, before the detectives reached North 25, Everett saw three men, who were later identified as defendant and his two co-defendants, on a sidewalk on Louise Lane running towards North 25 in the opposite direction of the location of the shooting. According to

_____

[1] According to the Trenton Police Department's communications chief, the CAD or computer-aided dispatch system "aids the dispatcher and the call takers in logging in the assignments, the calls that come in, and also [in] maintaining the times for the officers when they respond to the assignments . . . ." Most of the calls and some of the dispatches are recorded.

Everett, Louise Lane was "the quickest route between North 25 and Prospect Village." When Everett told Cincilla she had seen the three men, he turned the vehicle onto Louis Lane, driving slowly.

When defendant and his co-defendants saw the detectives, "they all immediately and instantaneously began walking as if to act natural." The detectives noticed the three men "were all sweating" and "breathing heavily." Cincilla recognized defendant as someone he previously had seen at North 25 during prior investigations. Co-defendant Jashawn Smith had a "hoodie" in his hand and defendant was "carrying a black hooded sweatshirt at his waist," even though it was a sunny, ninety-degree day. Defendant was "manipulating [the] . . . sweatshirt in his hands while holding it very low and he was kind of shifting it . . . left and right . . . as if he was attempting to discard something." Everett saw defendant drop "the sweatshirt right next to the parked car" and then walk away from the car without the sweatshirt. Cincilla also saw defendant "shaking" the sweatshirt against the car.

The detectives stopped and exited their vehicle. Everett believed the three men were "potential suspects in the shooting" because of the known feud between the North 25 and Prospect Village gangs and her observations of them, including the direction in which they were running, that they stopped running

4

when they saw the detectives, their clothing, and defendant's apparent effort to drop something. Out of safety concerns and "to possibly detain them," Everett, with her handgun drawn, ordered the three men to get on the ground. Defendant and co-defendant Juprie Wadley complied immediately; co-defendant Smith ran. Cincilla pursued Smith and eventually recovered a nine-millimeter, semi-automatic handgun Smith had dropped when he stopped running.

While Cincilla pursued Smith, Everett handcuffed defendant and co-defendant Wadley and radioed dispatch for additional support. Detectives Stewart Owens and Jose Gonzales arrived at the scene. Out of concern for officer safety and believing them to be suspects in a shooting, the detectives conducted pat-down searches of defendant and co-defendant Wadley. Everett found a .22 caliber handgun in Wadley's pocket. Owens retrieved the sweatshirt defendant had dropped next to the parked car. He began to search the area further but saw "a large group of people approaching . . . from the area of North 25." Because the people in the crowd were "irate" and were "screaming profanities" at them, the detectives placed defendant and Wadley in the back of a patrol vehicle and left for police headquarters.

At police headquarters, Owens learned the .32 caliber shell casings found at the crime scene did not match the .22 caliber handgun recovered from Wadley

or the nine-millimeter handgun Smith had dropped. Because the handguns did not match the crime-scene shell casings, Owens and a sergeant with the Street Crimes Unit returned to search for another weapon. They found a .32 caliber handgun underneath the parked car where defendant had dropped his sweatshirt. State Police tests confirmed that handgun's ballistics matched the eight spent shell cases and one projectile recovered from the crime scene.

B.

A grand jury indicted defendant and his co-defendants jointly on first-degree murder, N.J.S.A. 2C:11-3(a)(2) and 2C:2-6, and other second-degree weapons-related offenses and defendant individually for second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b).

Co-defendant Smith moved to suppress "all evidence illegally obtained pursuant and subsequent to a warrantless seizure by Trenton Police officers on June 11, 2016." Co-defendant Wadley similarly moved to suppress. Defendant joined in their motions. After a two-day evidentiary hearing, Judge Robert C. Billmeier denied the motions in a comprehensive, twenty-three-page written opinion. Finding the detectives credible, Judge Billmeier held their decision to stop defendant was based on "reasonable articulable suspicion."

A-0379-18

On June 25, 2018, pursuant to a negotiated plea agreement, defendant pleaded guilty to one count of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1). In the plea form he executed, defendant acknowledged he was aware he "must pay restitution if the court finds there is a victim who has suffered a loss and if the court finds that you are able or will be able in the future to pay restitution."

Defendant and his co-defendants were sentenced pursuant to their respective plea agreements during a joint hearing they and their counsel attended on August 31, 2018. During the sentencing hearing, the State requested the court order defendant, jointly and severally with his co-defendants, to pay restitution of $5,000 to the Victims of Crimes Compensation Office (VCCO) and $2,355 to the victim's mother for funeral expenses. Regarding the victim's mother's restitution, co-defendant Smith's counsel asked for "documentation so [he had] something to demonstrate what exactly was spent and then [defendant] can concede to that." State v. Smith, No. A-2048-18 (App. Div. Nov. ___, 2021) (slip op. at 10). In response to Smith's counsel's request, Judge Billmeier stated, "when I prepare the [Judgment of Conviction] . . . I'll impose the $5,000 [VCCO restitution] subject to the addition of $2,355" in restitution for the victim's mother and told defense counsel to "advise the [c]ourt whether [defendant]

require[s] a hearing" after having had an opportunity to review the supporting documentation provided by the State. Ibid. In sentencing George, Judge Billmeier stated he "will order $5,000 restitution joint and several with co-defendants to the VCCO" and "will keep open for 30 days the out-of-pocket expenses of the family." Defendant's counsel did not object to that procedure.

The judge issued the initial Judgment of Conviction. On September 4, 2018, the assistant prosecutor sent an email to court staff, defendant's counsel, and co-defendants' counsel, indicating the State had understood the judge would not issue judgments until after the parties resolved the restitution issue. The judge's assistant responded, "[i]f the defendants agree to the additional restitution the court will amend the [Judgments of Conviction] accordingly. If the defendants do not agree to the additional amounts, the [j]udge will conduct a restitution hearing." Six days later, the assistant prosecutor sent to the court, defendant's counsel, and co-defendants' counsel an email attaching receipts for the funeral and burial costs incurred by the victim's mother, totaling $2,415, and asking the judge to amend the judgments to include that amount in restitution to the victim's mother. The judge's assistant sent an email, asking "if the defendants agree to the additional restitution request." Defendant's and co-defendants' counsel agreed to the restitution amount. Defendant's counsel

expressly stated, "[a]greed on behalf of Wilson George." With all defense counsel stating their clients' agreement to the restitution amount and none of them requesting the restitution hearing the judge had offered, the judge did not conduct a restitution hearing and issued revised judgments including the agreed-on restitution.

In this appeal, defendant argues:

> POINT I
>
> THE RADIO DISPATCH STATING WITHOUT FURTHER DETAIL THAT "THREE SUSPECTS" HAD FLED A SHOOTING DID NOT GIVE OFFICERS A BASIS TO ORDER THE DEFENDANTS -- THREE YOUNG BLACK MEN RUNNING ON THE SIDEWALK ON A SUMMER AFTERNOON -- ONTO THE GROUND AT GUNPOINT.
>
> POINT II
>
> THE MATTER MUST BE REMANDED FOR A HEARING ON DEFENDANT'S ABILITY TO PAY THE RESTITUTION IMPOSED.

## II.

Our scope of review of a suppression decision is limited. State v. Ahmad, 246 N.J. 592, 609 (2021). We uphold a trial court's factual findings made in connection with a motion to suppress when "those findings are supported by sufficient credible evidence in the record." Ibid. (quoting State v. Elders, 192

N.J. 224, 243 (2007)). We defer to a trial court's factual findings because they are "informed by [the court's] first-hand assessment of the credibility of the witnesses . . . ." State v. Lentz, 463 N.J. Super. 54, 67 (App. Div. 2020). "[A] trial court's factual findings should not be overturned merely because an appellate court disagrees with the inferences drawn and the evidence accepted by the trial court," State v. S.S., 229 N.J. 360, 374 (2017), but only if the findings are "so clearly mistaken that the interests of justice demand intervention and correction," State v. Gamble, 218 N.J. 412, 425 (2014) (quoting Elders, 192 N.J. at 244). We review de novo a trial court's legal conclusions. Ahmad, 246 N.J. at 609.

A.

The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution forbid law enforcement from conducting unreasonable searches and seizures. State v. Terry, 232 N.J. 218, 231 (2018). A warrantless search or seizure is presumptively unreasonable and invalid. State v. Chisum, 236 N.J. 530, 545 (2019); State v. Hagans, 233 N.J. 30, 38 (2018). For a court to find permissible a warrantless search or seizure, the State must prove the search or seizure fell within one of the few recognized

exceptions to the warrant requirement. Chisum, 236 N.J. at 545. An "investigatory stop of a person" is one of those exceptions. Ibid.

A seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." Terry v. Ohio, 392 U.S. 1, 16 (1968). "Because an investigative detention is a temporary seizure that restricts a person's movement, it must be based on an officer's 'reasonable and particularized suspicion . . . that an individual has just engaged in, or was about to engage in, criminal activity.'" State v. Rosario, 229 N.J. 263, 272 (2017) (quoting State v. Stovall, 170 N.J. 346, 356 (2002)). An investigative stop is permissible "if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity." State v. Pineiro, 181 N.J. 13, 20 (2004) (quoting State v. Nishina, 175 N.J. 502, 511 (2003)). It is not permissible if it is based on "arbitrary police practices, the officer's subjective good faith, or a mere hunch." State v. Coles, 218 N.J. 322, 343 (2014).

Reasonable suspicion is an objective, fact-sensitive inquiry. Pineiro, 181 N.J. at 22; see also State v. Dunbar, 434 N.J. Super. 522, 526 (App. Div. 2014). A court must determine "whether at the moment of seizure, the officer had at his [or her] command sufficient facts supporting a person of reasonable caution in

the belief that seizure was appropriate." Dunbar, 434 N.J. Super. at 526. "[I]n evaluating whether an officer had a reasonable suspicion to conduct a brief investigatory stop," a court must consider "[t]he totality of the circumstances," including the "officer's experience and knowledge." Pineiro, 181 N.J. at 22.

Defendant argues the detectives "lacked a valid basis for their actions in immediately ordering defendants onto the ground at gunpoint" and "the evidence discovered as a result of the stop should be suppressed." That argument is meaningless as to defendant because no evidence was recovered from or about him as a result of the stop. He discarded his sweatshirt and the .32 caliber handgun under a parked car on a public road before Detective Everett ordered defendant and his co-defendants to the ground.

Defendant argues for the first time on reply that the State "has not met its burden to establish that [defendant] abandoned the gun before he was unlawfully detained." Raising an argument on reply for the first time is improper and unfair; it deprives the respondent of an opportunity to respond. See Fuhrman v. Mailander, 466 N.J. Super. 572, 599 (App. Div. 2021) ("A matter raised for the first time in a reply brief need not be addressed by this court."); Bacon v. N.J. State Dep't of Educ., 443 N.J. Super. 24, 38 (App. Div. 2015) (raising an argument in a reply brief on appeal, and not in an initial appellate brief,

constitutes waiver of that argument).[2]  Defendant also did not raise that argument before Judge Billmeier.  Instead, defendant denied the handgun belonged to him or had been in his possession.  As Judge Billmeier found, defendant "cannot have been the victim of an illegal seizure of an item he does not admit to ever possessing."  Accordingly, he concluded he was not required to determine whether defendant had abandoned the handgun.  Judge Billmeier nevertheless considered the issue, anticipating defendant might "change [his position] at some future date and . . . acknowledge[] having possessed the gun on June 11, 2016 . . . ."  Judge Billmeier noted "no other owners are known or alleged, so the critical issue would turn on whether [defendant] voluntarily and knowingly relinquished the handgun."  As he concluded, "[u]nder the State's version of events," which he had found credible,

> Defendant George's actions would be those of someone who has knowingly and voluntarily relinquished control of an object.  He would have left the handgun underneath a car he did not own, and whose owner he did not know, parked on a public street.  This would

---

[2]  In addition to raising this new argument on reply, defendant attempted to raise in a letter a new argument challenging for the first time defendant's sentence.  In submitting that letter, defendant relied on Rule 2:6-11(d), which permits a party without leave to submit a letter calling our attention to "relevant published opinions issued or legislation enacted . . . subsequent to the filing of the brief."  Because the subject of defendant's letter does not relate to any issue raised in his appeal, it was not "relevant" to defendant's appeal and we decline to consider it in this appeal.

A-0379-18

> appear to be a clear instance of "the recognized theme of abandonment of personal property for purposes of constitutionally protected privacy." State v. Burgos, 185 N.J. Super. 424, 427 (App. Div. 1982).

Even if we were inclined to consider defendant's belated and improper argument, and we aren't, we see as persuasive Judge Billmeier's well-reasoned analysis of the abandonment issue and not persuasive defendant's factually unsupported and speculative suggestion he may have abandoned the gun after Everett ordered him to the ground.

Assuming defendant had standing to seek suppression, the detectives, as Judge Billmeier found, had enough information based on the totality of circumstances to form a "reasonable articulable suspicion" defendant had been engaged in criminal activity justifying the investigative stop. Everett and Cincilla knew not only that Prospect Village and North 25 were high-crime areas but also that gangs from those neighborhoods were engaged in an on-going feud. Their decision to look for suspects in North 25 was more than a hunch; it was based on their knowledge and experience.

The detectives credibly testified they had heard three suspects were fleeing the scene of the shooting in Prospect Village; they saw defendant as one of three men running from the direction of Prospect Village toward North 25 on the quickest route between those neighborhoods. The three men were sweating

14

and "breathing heavily." Cincilla recognized defendant and knew from prior investigations he was from North 25. Cincilla and Everett saw the three men "immediately and instantaneously" begin to walk "as if to act naturally" after seeing the detectives. They noticed defendant and co-defendant Smith carrying sweatshirts, which was suspicious under the circumstances on that ninety-degree, sunny day. They observed defendant shaking his sweatshirt behind a car as if he were attempting to discard something and then leave the sweatshirt behind the car. That behavior was more than mere "[n]ervousness and excited movements" and occurred before the stop. See Rosario, 229 N.J. at 277. And that information collectively was sufficient to enable the detectives to form a reasonable and particularized suspicion of criminal activity.

Defendant urges us to make different credibility or factual determinations than the motion judge made. We see no basis to do so. Defendant also would have us focus on the facts, each of which he says lacks reason for suspicion, individually. While we reject defendant's innocent portrayal of the individual facts, we recognize "[e]ven if all of the factors were susceptible of purely innocent explanations, a group of innocent circumstances in the aggregate can support a finding of reasonable suspicion." Stovall, 170 N.J. at 368. Looking at the facts in the aggregate as we must, Pineiro, 181 N.J. at 22, the detectives'

15

knowledge and observations supported a finding of reasonable suspicion of criminal activity such that the investigatory stop and resulting seizure of evidence were lawful.  We affirm Judge Billmeier's denial of the suppression motions.

B.

The purpose of restitution is to rehabilitate, not punish, the defendant and to compensate the victim.  State v. DeAngelis, 329 N.J. Super. 178, 190 (App. Div. 2000); State in Interest of R.V., 280 N.J. Super. 118, 122 (App. Div. 1995). N.J.S.A. 2C:44-2(b) requires a court to sentence a defendant to pay restitution "if:  (1) [t]he victim, or in the case of a homicide, the nearest relative of the victim, suffered a loss; and (2) [t]he defendant is able to pay or, given a fair opportunity, will be able to pay restitution."  In determining the amount of restitution, a court must "take into account the financial resources of the defendant and the nature of the burden that its payment will impose."  N.J.S.A. 2C:44-2(c)(1); see also State v. Williams, 467 N.J. Super. 1, 7 (App. Div. 2021).

"When a sentencing court has not conducted a meaningful evaluation of a defendant's ability to pay, appellate courts routinely vacate restitution orders and remand for reconsideration."  RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 478 (2018).  However, when there is "no dispute as to the amount

ordered or defendant's ability to make restitution . . . [n]o restitution hearing is required . . . ." State v. Orji, 277 N.J. Super. 582, 589-90 (App. Div. 1994).

Here, defendant did not dispute the amount ordered or his ability to make restitution. When, at the sentencing hearing, the State requested restitution of $5,000 to VCCO and $2,355 to the victim's mother, co-defendant Smith's counsel asked for documentation regarding the mother's expenses. The judge outlined the procedure they would follow: defendants would review the requested documentation and advise the court whether they needed a restitution hearing. Defendant's counsel did not object to that procedure. The judge's assistant confirmed in an email the judge would conduct a restitution hearing if defendant did not agree to the requested restitution amount. After defendant's counsel had an opportunity to review the State's documentation, instead of asking to have the restitution hearing offered by the judge, he advised the court in an email, he "[a]greed on behalf of George Wilson." Having agreed to the procedure outlined by the court and to the restitution requested by the State, defendant is bound by it. We see no error in the restitution award or the procedure followed by court and parties.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION