**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0458-19

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JEFFREY VAN QUEEN,
a/k/a RILEY FRANKLIN,

      Defendant-Appellant.

_____

Submitted November 4, 2021 – Decided February 7, 2022

Before Judges Fuentes and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 17-01-0004.

Joseph E. Krakora, Public Defender, attorney for appellant (Margaret McLane, Assistant Deputy Public Defender, of counsel and on the briefs).

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Jennifer E. Kmieciak, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

After a judge denied his motion to suppress evidence seized during a warrantless motor-vehicle search and another judge declared a mistrial after a jury failed to reach a verdict, defendant pleaded guilty to one charge of second-degree unlawful possession of an assault firearm, N.J.S.A. 2C:39-5(f), and was sentenced to a seven-year prison term. Because the undisputed facts do not establish a reasonable articulable suspicion defendant was involved in criminal activity, the investigatory stop of defendant's vehicle was not justified, and the evidence obtained in the subsequent warrantless and unlawful motor-vehicle search should have been suppressed. Accordingly, we reverse defendant's conviction, vacate his sentence, and remand for further proceedings.

I.

We glean the following facts from the record developed during the suppression hearing.

A.

On February 20, 2016, New Jersey State Police Detective Sergeant James Sansone and Detective Kartik Birudaraju were conducting surveillance around Perry Street and North Warren Street in Trenton after receiving reports of drug activity in the vicinity. Sansone saw a man, later identified as defendant, twice "poke his head out of a residence" on North Warren Street and "look[] both ways

2

. . . in . . . a nervous manner." Sansone thought looking both ways was "suspicious" because North Warren Street is a one-way street and yet defendant was "looking . . . as if a vehicle would be coming . . . down the wrong way." Defendant was "carrying a large, green style . . . Army style, duffel bag and was holding it with two hands . . . under an arm." The duffel bag completely concealed its contents. Defendant walked out of the residence with the duffel bag and placed it in the rear compartment of an SUV parked very close to the residence on the same side of the street. Defendant then walked to the front of the SUV, "looking in all directions," and returned to the porch of the residence. After spending a "couple" minutes standing on the porch, defendant went back to the SUV, entered it on the driver's side, sat in it "for a couple of minutes," and drove off.

Seeing how defendant was holding the duffle bag, Sansone "immediately determined . . . based on [his] training and experience" it contained "a weapon." Sansone used a similar bag to transport his rifle when he was assigned to carry a rifle for work. The duffle bag, coupled with defendant "acting in a suspicious manner," caused Sansone to "automatically believe[]" defendant was carrying a weapon.

3

Birudaraju also saw defendant "exit from one of the residences, . . . look[] back and forth up and down the street quickly in almost like a nervous, panicky manner, and reenter that residence and then moments later do the same thing and then exit from that residence." Birudaraju saw defendant carrying "a green duffel bag," "holding it with two hands . . . underneath his arm, trying to hold the weight of the item in the bag up." According to Birudaraju, "after the second time he looked, . . . [defendant] . . . quickly maneuvered [the duffle bag] out of the residence to a black SUV," placing it in the "rear compartment." Based on his "training and experience," Birudaraju believed the duffle bag contained "a long gun . . . [by] the way [defendant] was handling it. . . ."

After observing defendant place the duffle bag in the SUV, Sansone and Birudaraju radioed other members of their surveillance detail, stating they had seen "a black male coming out of a residence who appeared . . . to have a rifle in his possession." Sansone and Birudaraju communicated that defendant had "appeared to be nervous, he was looking up and down the street, and just the way he was holding the bag, it appeared like he had a long gun or a rifle of a sort." Detective Carlos Estevez, who was also performing surveillance nearby, made an "operational decision" to follow defendant's SUV. Estevez testified

4

that based on the information provided by Sansone and Birudaraju, he decided he would attempt to instigate an investigatory stop.

As Sansone and Birudaraju described the direction in which the man they had observed was driving, Estevez "observed the vehicle at the intersection there of North Warren and Perry." Following defendant's vehicle, Estevez observed defendant fail to come to a complete stop at a red light. Estevez pulled defendant's vehicle over. Estevez testified defendant's "car was getting stopped whether there was a motor vehicle violation or not." With other members of his unit, Estevez approached defendant's SUV. He saw a "scope lens cover" in the center console and smelled "a strong odor of burnt marijuana emanating from inside the vehicle. . . ." Estevez ordered defendant out of the vehicle for two reasons:

> First, we received information during surveillance that members of the unit observed what appeared to be a possible rifle being placed in the rear compartment of the vehicle. So for officer safety in the case that there was a firearm in the vehicle we removed him from the vehicle. [Second,] we had the odor of burnt marijuana coming from inside the vehicle.

Although Estevez testified on direct examination that the burnt-marijuana odor was one of the two reasons police had ordered defendant to exit the vehicle, on cross-examination Estevez stated he smelled the burnt-marijuana odor after

5

defendant had exited the vehicle.  After being told police had detected the odor of burnt marijuana coming from inside the SUV, defendant admitted he "had smoked weed prior inside the vehicle."

The police then conducted "a probable cause search" of the SUV.  When he was in the "passenger area of the rear seat," Estevez saw "in the rear compartment of the vehicle a duffel bag . . . with the stock of what appeared to be a rifle sticking out of the rear of it."  He described the duffle bag as looking "almost like a military backpack."  The police searched the duffel bag and found an assault rifle, two magazines, and bullets.  They ultimately did not find any marijuana or marijuana paraphernalia in defendant's vehicle or on his person. They arrested defendant and brought him to the station.

## B.

A grand jury indicted defendant and charged him with second-degree unlawful possession of an assault firearm, N.J.S.A. 2C:39-5(f); fourth-degree unlawful possession of a large capacity magazine, N.J.S.A. 2C:39-3(j); third-degree receiving stolen property, N.J.S.A. 2C:20-7(a) and -2(b) and second-degree being a certain person not permitted to possess weapons, N.J.S.A. 2C:39-7(b).

A-0458-19

Defendant moved to suppress the evidence seized during the warrantless search conducted after the February 20, 2016 vehicle stop.  The motion judge conducted a one-day evidentiary hearing, during which Sansone, Birudaraju, and Estevez testified.

The motion judge issued an order and placed a decision on the record denying defendant's motion.  Rejecting defendant's argument, the police had lacked probable cause to effectuate a search of the SUV, the motion judge found the detectives credible and concluded "the police clearly developed probable cause to believe that the defendant was in possession of a firearm, specifically a rifle or some other type of long gun."  The judge found the duffle "bag lent itself to carrying a rifle" and that "the size of the bag and the way the defendant held it and manipulated it, indicated . . . the bag contained a gun."  As for how defendant held and "manipulated" the bag, the judge described defendant holding "the bag under his arm with two hands.  One hand was at the top, another was in the middle."  Finding defendant had "display[ed] a lot of nervous type conduct," the judge determined "defendant's conduct suggests nervousness that would be inconsistent with having a lawful right to carry the gun."  While the motion judge found defendant's suspicious behavior supported the conclusion he had a gun, he also found that the belief he had a gun supported the conclusion

A-0458-19

he was behaving in a suspicious way: "he was acting suspicious . . . which was supportable by the fact that the defendant clearly appeared to be carrying contraband." The judge found the actual reason for the motor-vehicle stop was not defendant's failure to stop at the red light, which was "just a pretextual basis for the stop," but the belief defendant "was carrying a gun." The judge held with that belief, the police had a right to stop the SUV.

The motion judge went on to find that "[o]nce they stopped the vehicle, [the police] were entitled to go where facts and circumstances took them." The judge believed the observation of the scope lens cover and detection of burnt-marijuana odor "added to the police authority here," entitling them to search the vehicle without first obtaining a search warrant. Citing State v. Robinson, 228 N.J. 529 (2017), and State v. Witt, 223 N.J. 409 (2015), the motion judge also concluded the police had a right to conduct a protective sweep of the SUV, even though defendant was no longer in it.

A jury and a different judge presided over defendant's trial. After the jury was unable to reach a verdict, the trial judge declared a mistrial. Pursuant to a subsequent plea agreement, defendant pleaded guilty to unlawful possession of an assault firearm, N.J.S.A. 2C:39-5(f), in exchange for the dismissal of the other pending charges. The trial judge sentenced plaintiff to seven years in

8

prison in accordance with the plea agreement, with a mandatory three and a half years of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c). Defendant preserved his right to appeal the pre-trial denial of his motion to suppress.

In this appeal, defendant argues:

> I. THERE WAS NO PROBABLE CAUSE TO SEARCH DEFENDANT'S VEHICLE, SO THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS.

## II.

Our scope of review on a motion to suppress is limited. State v. Ahmad, 246 N.J. 592, 609 (2021). We "uphold the factual findings underlying the trial court's [suppression] decision so long as those findings are supported by sufficient credible evidence in the record." Ibid. (quoting State v. Elders, 192 N.J. 224, 243 (2007)). We review de novo a trial court's legal conclusions "and the consequences that flow from established facts." State v. Hubbard, 222 N.J. 249, 263 (2015); see also State v. Nyema, ___ N.J. ___, ___ (2022) (slip op. at 21).

The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution forbid law enforcement from conducting unreasonable searches and seizures. State v. Terry, 232 N.J. 218,

9

231 (2018).  A warrantless search or seizure is presumptively unreasonable and invalid.  State v. Chisum, 236 N.J. 530, 545 (2019); State v. Hagans, 233 N.J. 30, 38 (2018); see also Elders, 192 N.J. at 246 (finding "our constitutional jurisprudence evinces a strong preference" for searches conducted pursuant to "judicially issued warrants").  For a court to find permissible a warrantless search, the State must prove by a preponderance of the evidence the search fell within one of the few recognized exceptions to the warrant requirement.  Chisum, 236 N.J. at 545; see also Nyema, ___ N.J. ___ (slip op. at 22).

One recognized exception is an "an investigative stop, a procedure that involves a relatively brief detention by police during which a person's movement is restricted."  Nyema, ___ N.J.  ___ (slip op. at 22); see also State v. Rosario, 229 N.J. 263, 272 (2017).  A "roadside stop by a police officer constitutes a seizure under both the Federal and New Jersey Constitutions."  State v. Dunbar, 229 N.J. 521, 532 (2017).  It doesn't matter how "brief or limited" the stop is.  State v. Scriven, 226 N.J. 20, 33 (2016).

"To be lawful, an automobile stop 'must be based on reasonable and articulable suspicion that an offense, including a minor traffic offense, has been or is being committed.'"  State v. Bacome, 228 N.J. 94, 103 (2017) (quoting State v. Carty, 170 N.J. 632, 639-40 (2002)).  "An investigative detention is

permissible 'if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity.'" Chisum, 236 N.J. at 545-46 (quoting State v. Pineiro, 181 N.J. 13, 20 (2004)). An investigatory stop is not permissible if it is "based on arbitrary police practices, the officer's subjective good faith, or a mere hunch." State v. Coles, 218 N.J. 322, 343 (2014). A decision to conduct an investigatory stop must be supported by "some objective manifestation that the suspect was or is involved in criminal activity." State v. Thomas, 110 N.J. 673, 678 (1988); see also State v. Williams, 410 N.J. Super. 549, 555 (App. Div. 2009).

"[T]o determine whether officers objectively possessed reasonable and articulable suspicion to conduct an investigatory stop," a court must consider "the totality of the circumstances of the encounter . . . in a very fact-sensitive analysis." Nyema, ___ N.J. ___ (slip op. at 28). A "suspect's conduct can be a factor, but when the conduct in question is an ambiguous indicator of involvement in criminal activity and subject to many different interpretations, that conduct cannot alone form the basis for reasonable suspicion." Id. at ___ (slip. op. at 32). "Information acquired after a stop cannot retroactively serve as the basis for the stop." Id. at ___ (slip op. at 30).

Applying those principles to this case, the question before us is whether Estevez had a reasonable articulable suspicion defendant was engaged in criminal activity when he stopped defendant's vehicle. In addressing that question, we do not consider defendant's alleged failure to stop at a red light. Estevez admitted he did not stop defendant's car because of the alleged traffic violation and that defendant's "car was getting stopped whether there was a motor vehicle violation or not." Based on that admission, the motion judge found the alleged traffic violation was "just a pretextual basis for the stop" and the real reason for the stop was the belief defendant "was carrying a gun."

Estevez's decision to stop defendant's car was based entirely on the report from Sansone and Birudaraju of "a black male coming out of a residence who appeared . . . to have a rifle in his possession." The record is devoid of any evidence Sansone and Birudaraju described in their radio call the vehicle the "black male" was driving, other than to relate the direction in which he was driving it. Seeing a "black male" driving a vehicle in the direction related by Sansone and Birudaraju, Estevez decided to stop that vehicle.

Sansone's and Birudaraju's belief defendant had a rifle was based on defendant's "nervous" appearance and "suspicious manner," the type of bag he had, and the way he held the bag. His purportedly "nervous" and "suspicious"

12

conduct was that he twice looked up and down a one-way street when he came out of his residence and was "looking in all directions" when he returned to his residence.

The motion judge based his decision on a factual finding defendant had "display[ed] a lot of nervous type conduct" and his "nervousness . . . would be inconsistent with having a lawful right to carry the gun." Engaging in circular reasoning, the judge found both that defendant's nervous and suspicious conduct indicated he was in the unlawful possession of a gun and that his apparent possession of contraband supported the conclusion defendant was acting suspiciously. The motion judge found the duffle "bag lent itself to carrying a rifle" and that "the size of the bag and the way the defendant held it and manipulated it, indicated . . . the bag contained a gun."

A duffle bag lends itself to carrying a lot of things. That is the nature of a duffle bag. Looking around a one-way street is not "display[ing] a lot of nervous type conduct" and is not sufficient credible evidence to support the motion judge's conclusion. It also is not inherently indicative of criminal behavior. Neither is carrying a duffle bag under an arm holding it with two hands. Defendant's conduct, at most, is an "ambiguous indicator of involvement in criminal activity and subject to many different interpretations, [which] cannot

13

alone form the basis for reasonable suspicion." <u>Nyema</u>, ___ N.J. ___ (slip. op. at 32).

The information Estevez received from Sansone and Birudaraju, on which he based his decision to stop defendant's vehicle, indicates a hunch and did not amount to objectively reasonable and articulable suspicion justifying an investigatory stop. Because the investigatory stop was improper, the subsequent search of the vehicle was illegal and the physical evidence seized in that search should have been suppressed.

Given our ruling on the stop, we need not address defendant's remaining arguments. Defendant's conviction and sentence are vacated, and the matter is remanded for further proceedings.

Reversed, vacated, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0458-19