**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1122-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

BRYANT D. TAYLOR,
a/k/a BRYAN D. TAYLOR,
BRYAN M. TAYLOR,
RONALD TAYLOR,
BRYON TAYLOR,
DWAYNE BRYANT, and
DUANE TAYLOR,

     Defendant-Appellant.

_____

Argued January 9, 2024 – Decided March 19, 2024

Before Judges Sumners and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 19-08-1129.

Tamar Yael Lerer, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Tamar Yael Lerer, of counsel and on the brief).

Alexis R. Agre, Assistant Prosecutor, argued the cause for respondent (LaChia L. Bradshaw, Burlington County Prosecutor, attorney; Alexis R. Agre, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

After a jury trial, defendant Bryant Taylor appeals from his convictions for causing the drug-induced death of Shane Cullens, controlled dangerous substance (CDS) offenses, and witness tampering. Defendant challenges the Law Division's denial of his motions to suppress, admission and denial of certain evidence at trial, denial of new counsel, jury instructions, sentence imposed, and denial of his applications for acquittal and a new trial. We affirm in part, reverse in part, and remand for the reasons expressed in this opinion.

I.

We discern the following facts from the record. On June 20, 2017, Shane Cullens passed away from a heroin and fentanyl overdose. Cullens lived with his mother and stepfather in Browns Mills and had struggled with drug addiction. At the time of his passing, he had a young son and was expecting a child with his girlfriend.

On June 17, Cullens had contacted his friend Robert Piersanti, who had previously resided with Cullens and considered him to be like a brother, to join

him in using heroin. Heavily addicted to heroin himself, Piersanti testified at trial that he agreed to Cullens's offer to pay, despite his belief that Cullens had stopped using drugs. They had used drugs together many times.

Piersanti contacted defendant, an "acquaintance" he knew as "B Rup," to purchase heroin. Cullens and Piersanti drove to defendant's home in Pemberton. After waiting for defendant, he arrived and Cullens purchased six packets of heroin from him for $40. The packets were stamped with a skull and "black writing." Piersanti had "never seen" the marking "prior to that or after." Cullens kept four packets and gave Piersanti two. They declined defendant's offer to sell them methamphetamine ("meth").

While parked in defendant's driveway, Cullens used heroin. He then pretended to suffer an overdose before laughing and telling Piersanti he "got [him]." They went to Piersanti's house so he could change clothes before meeting with friends. While home, Piersanti used heroin, became "pretty high[,] and [took] awhile" to leave. On their way, Cullens and Piersanti stopped at a Dollar Tree. Piersanti testified Cullens left the store first, and when he got to car, Cullens was there motionless. He initially thought Cullens was joking again, but noticed he had blue lips, was foaming from his mouth, and appeared not to be breathing. Piersanti feared Cullens had overdosed. He lowered

A-1122-21

Cullens's car seat and performed CPR, which he said took "forever, like at least a half hour or so," before Cullens regained consciousness.

Piersanti drove Cullens home, where they stayed until Cullens felt well enough to drive home. Piersanti did not call 9-1-1 or take Cullens to the hospital, as Cullens asked Piersanti not to tell anyone about his overdose.

The next day, Cullens contacted Piersanti for defendant's phone number. He allegedly had a friend looking to buy "ice," a street name for meth. Piersanti testified he initially refused to give Cullens the number because he thought Cullens was lying and wanted more heroin. However, persuaded Cullens was telling the truth, Piersanti ultimately gave him defendant's number.

According to his mother, Cullens left home around 3:00 p.m. Video surveillance showed him entering the Pemberton Wawa at approximately 4:24 p.m. Ten minutes later, Pemberton Township Police Officers Perry Doyle and John Hall responded to a call about a man, later identified as Cullens, lying unconscious in the bathroom. Cullens was found with a pulse and breathing. Doyle testified he observed what looked like needle marks on Cullens's arm, but he "didn't have any idea" what was wrong. Cullens had no drug paraphernalia or identification on his person, but he had a car key fob.

4

Doyle located and unlocked Cullens's Nissan Rogue with the fob.  After entering the vehicle looking for identification, Doyle found Cullens's driver's license.  Next to the license, Doyle observed a hypodermic needle and an unused "heroin packet" stamped in black and red with the word "Overtime" and a picture of a skull and crossbones.  He had never seen that stamp on a drug packet.  Doyle ran into the Wawa to advise Hall and the emergency medical personnel he had found CDS.  The medics administered the drug Narcan to reverse the effects of an opioid overdose.

Hall secured the needle and packet.  The police marked the needle for destruction and did not further examine it.  A chemist at the Burlington County Forensic Science Laboratory testified that the contents of the packet contained heroin mixed with fentanyl.  Piersanti confirmed the packet in the vehicle was similar to those purchased from defendant the day before.

An ambulance transported Cullens to the hospital, where he was stabilized and then transferred to a critical care facility.  At the hospital, Cullens's mother and stepfather retrieved his personal belongings and gave Doyle Cullens's cell

5

phone. They also gave the police four triangular pills, later identified as 150 milligrams of Trazodone,[1] found in Cullens's wallet.

Cullens passed away on June 20. Medical examiner Dr. Ian Hood testified blood samples taken from Cullens less than an hour after he was found at the Wawa contained heroin and fentanyl. Dr. Hood opined Cullens's cause of death was an anoxic brain injury caused by a heroin overdose. Further, the blood levels of morphine and fentanyl would not be considered high if taken for therapeutic, medical purposes, but Cullens had no reason for the CDS in his system. At trial, Kristopher Graf of NMS Labs also confirmed that the blood samples sent to the toxicology lab contained heroin and fentanyl.

Burlington County Prosecutor's Office detectives extracted from Cullens's cell phone the text conversation between Piersanti and Cullens regarding defendant's phone number. The day of Cullens's overdose, he had texted and called defendant, as well as other people, seeking drugs. Defendant and Cullens exchanged calls from 3:50 p.m. to 4:17 p.m. The last call was seven minutes before Cullens entered the Wawa.

---

[1] Trazodone is a "serotonin modulator," or antidepressant, that "is most often given at bedtime to depressed patients with insomnia." William Coryell, M.D., Medications for Treatment of Depression, MERCK MANUAL (Oct. 2023), https://www.merckmanuals.com/professional/psychiatric-disorders/mood-disorders/medications-for-treatment-of-depression.

6

FBI Special Agent John Hauger testified as an expert for the State on cellular tracking and positioning. He analyzed Cullens and defendant's location phone data, explaining his analysis revealed "the general geographic area" the phone was in and not "the exact spot." He also explained location data of this type is generated when a user makes a call or sends a text, and that "if there is a gap in time" between such activity, "we don't know where the phone is." However, he relayed it was possible to narrow down a phone's location to a specific tower sector. In his expert opinion, based on the data collected, on the evening of June 17, Cullens's phone was located within the same tower sector as defendant's home. On June 18, Cullens was again located in the same sector as defendant's home when he made his final call to defendant.

Defendant's expert Gerald R. Grant, Jr., a digital forensics investigator, testified to conducting his own analysis of the cell phone location information. Cullens's phone pinged multiple cell towers in Pemberton near defendant's home on June 18, including one it had also pinged on June 16 when Cullens texted someone in his contact list called "Sos" stating, "Yo, I'm out front." On cross-examination, Grant stated his cellular plotting of the towers revealed the same June 18 location as Hauger analyzed. He stated the "best conclusion" one could

7

reach was that the phone "was within the coverage of" a given sector, and he "couldn't say where it was within that sector."

About seven months after Cullen's died, Detective Danielle Hann interviewed defendant about the death. Defendant recalled spending time with Piersanti and "another guy" at his house on June 17. This was the only portion of defendant's statement played for the jury at trial.

At trial, defendant testified he was friends with Piersanti, and they frequently spent time together. He also acknowledged "call[s] back and forth" with Cullens on June 18, but denied ever selling Cullens or Piersanti CDS. On cross-examination, he admitted to several past criminal convictions.

Piersanti testified defendant's acquaintance contacted him in June 2019 through Facebook under the name "BigRich Sosa." At the time, defendant was detained and awaiting trial. He wanted Piersanti to sign an affidavit that his previous statements to the police implicating defendant were made "under duress."

The following month, while incarcerated, defendant asked Lieutenant Enrique Hernandez to print a document from a shared USB flash drive he used to save and print files. Hernandez testified he printed the document for defendant and saw it was titled "Recanting Statement Containing

8

Misinformation."   Hernandez gave the document to defendant, but later mentioned it to Lieutenant Nicholas Ptaszenski in "casual conversation."

Ptaszenski reviewed the drive as part of an investigation into whether inmates were using it to communicate about contraband and found defendant's document.   He "thought it was concerning," and contacted the Prosecutor's Office.   On the advice of Prosecutor's Office Detective Jonathan Micken, detectives monitored the mail and seized the document, which defendant addressed to the acquaintance.

The document was written on Piersanti's behalf, stating because he was "high and nervous" when speaking to police during the investigation into Cullens's death, he wrongfully attributed "fault" to "B Rup."   The letter stated Piersanti found it "easier to just place blame on [defendant]," who was a friend he got high with and who had "a record."   It further provided Piersanti and Cullens "never purchased drugs from [defendant]" and "apologize[d]" for "wrongfully accus[ing]" him.   Defendant's handwritten instructions to the acquaintance advised Piersanti was to sign and notarize the typed statement and to send copies to defense counsel and the prosecutor.   At trial, defendant admitted to writing both documents.

9

The jury considered the following charges against defendant: first-degree strict liability for drug-induced death, N.J.S.A. 2C:35-9(a) (count one); two counts of third-degree possession of CDS, N.J.S.A. 2C:35-10(a)(1) (counts two and five); two counts of third-degree possession of CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1), (b)(3) (counts three and six); two counts of third-degree distribution of CDS, N.J.S.A. 2C:35-5(a)(1), (b)(3) (counts four and seven); and third-degree witness tampering, N.J.S.A. 2C:28-5(a)(1) (count eight). The jury convicted defendant on all counts.

The State moved for an extended sentence, arguing defendant was a persistent offender under N.J.S.A. 2C:44-3(a). After argument, the court found aggravating factors: three, N.J.S.A. 2C:44-1(a)(3), "risk that the defendant will commit another offense"; six, N.J.S.A. 2C:44-1(a)(6), "extent of the defendant's prior criminal record and the seriousness of the offenses of which the defendant has been convicted"; and nine, N.J.S.A. 2C:44-1(a)(9), "need for deterring the defendant and others from violating the law." The court found no mitigating factors.

The court sentenced defendant to an extended term of imprisonment of twenty five years on count one, strict liability for drug-induced death, subject to an eighty-five percent period of parole ineligibility under the No Early Release

10

Act (NERA), N.J.S.A. 2C:43-7.2, concurrent to a term of five years on count four, distribution of heroin, and consecutive to a term of five years on count seven, distribution of heroin, and to a term of five years on count eight, witness tampering.  All other counts were merged.

## II.

On appeal defendant argues:

POINT I

THE WARRANTLESS SEARCHES OF [CULLENS]'S PHONE AND CAR WERE ILLEGAL.

A. New Jersey's Broad Standing Rules Were Designed To Vindicate Important Privacy Rights and Deter Police Misconduct.

B. Defendant Had Standing To Challenge The Search Of The Phone.

C. Defendant Had Standing To Challenge The Search Of The Car.

POINT II

BECAUSE DEFENDANT DID NOT RECEIVE APPROPRIATE MIRANDA[2] WARNINGS, HIS STATEMENT SHOULD NOT HAVE BEEN ADMITTED.

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

POINT III

ADMISSION OF OTHER-BAD-ACT EVIDENCE, INCLUDING THAT DEFENDANT HAD PREVIOUSLY DISTRIBUTED DRUGS THAT ALMOST [LED] TO DECEDENT'S DEATH, REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS. (Not Raised Below).

A. The Admission Of Voluminous Testimony About Defendant's Prior Drug Dealing, Including Drug Dealing That Had Almost Killed The Decedent In This Case, Without Any Limiting Instruction Violated Defendant's Right To A Fair Trial.

B. The Admission Of Voluminous Testimony About Defendant's Prior Criminal Record And Incarceration, Without Appropriate Limiting Instructions Violated Defendant's Right To A Fair Trial.

POINT IV

LAY OPINION TESTIMONY WAS INADMISSIBLE, UNFAIRLY BOLSTERED THE STATE'S CASE, AND REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS. (Not Raised Below).

POINT V

DEFENDANT WAS IMPROPERLY CONVICTED MULTIPLE TIMES FOR POSSESSING AND DISTRIBUTING THE SAME DRUG. (Not Raised Below).

12

POINT VI

THE TRIAL COURT'S FAILURE TO CONDUCT THE APPROPRIATE INQUIRY WHEN DEFENDANT REQUESTED NEW COUNSEL REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

POINT VII

EVEN IF ANY ONE OF THE COMPLAINED-OF ERRORS WOULD BE INSUFFICIENT TO WARRANT REVERSAL, THE CUMULATIVE EFFECT OF THOSE ERRORS WAS TO DENY DEFENDANT DUE PROCESS AND A FAIR TRIAL. (Not Raised Below).

POINT VIII

DEFENDANT'S SENTENCE IS EXCESSIVE AND WAS IMPROPERLY IMPOSED.

In a supplemental self-represented brief, defendant raises these additional

arguments which are renumbered for ease of reference:

POINT IX

DEFENDANT WAS DEPRIVED OF DUE PROCESS WHERE NO REASONABLE JUROR WOULD HAVE FOUND GUILT FOR DRUG-INDUCED DEATH BEYOND A REASONABLE DOUBT.

A. No witness testified [defendant] gave any drugs to . . . Cullens on June 18, 2017, the day of the overdose.

13

A-1122-21

B. No witness testified [defendant] had heroin on June 18, 2017.

C. There is no cell tower evidence that on June 17, 2017, . . . Cullens was at or near [defendant's] home.

D. Cullens told Piersanti that he needed "ice" for a friend implying that [he] did not need heroin because he already had some at the time of the text message.

E. Piersanti admitted that he and . . . Cullens obtained heroin from other unnamed sources earlier in June of 2017, suggesting th[at] . . . Cullens knew where to obtain heroin without [defendant].

F. Without an autopsy of . . . Cullens, there is no way to determine whether any alleged conduct by [defendant] could have been the proximate cause of his death, where other drugs were found in . . . Cullens['s] vehicle.

POINT X

DEFENDANT WAS DEPRIVED THE RIGHT TO COMPULSORY PROCESS WHEN THE JUDGE DENIED A DEFENSE EXPERT IN THE FIELD OF DRUG TRANSACTIONS AND PREPARATION.

III.

"We ordinarily will not disturb the trial court's factual findings unless they are 'so clearly mistaken "that the interests of justice demand intervention and correction."'" State v. Goldsmith, 251 N.J. 384, 398 (2022) (quoting State v.

14

Gamble, 218 N.J. 412, 425 (2014)). However, we review a trial court's legal conclusions de novo. State v. Hubbard, 222 N.J. 249, 263 (2015).

## A. Warrantless Vehicle and Cell Phone Searches

Defendant argues the court erred in denying his motions to suppress evidence obtained from the warrantless searches of Cullens's car and cell phone because he lacked standing to challenge the searches.

"When reviewing a trial court's decision to grant or deny a suppression motion, appellate courts '[ordinarily] defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record.'" State v. Smart, 253 N.J. 156, 164 (2023) (alteration in original) (quoting State v. Dunbar, 229 N.J. 521, 538 (2017)). An appellate court should not disturb the trial court's findings because it might have reached a different conclusion, but may do so only "if they are so clearly mistaken that 'the interests of justice demand intervention and correction.'" State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).

"The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, in almost identical language, protect against unreasonable searches and seizures." Smart, 253 N.J. at 164 (quoting State v. Nyema, 249 N.J. 509, 527 (2022)). "Warrantless seizures and

A-1122-21

searches are presumptively invalid as contrary to the United States and the New Jersey Constitutions." State v. Pineiro, 181 N.J. 13, 19 (2004). "To justify a warrantless search or seizure, 'the State bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure falls within one of the few well-delineated exceptions to the warrant requirement.'" State v. Vanderee, 476 N.J. Super. 214, 230 (App. Div. 2023) (alteration in original) (quoting State v. Chisum, 236 N.J. 530, 546 (2019)).

"[T]o contest at trial the admission of evidence obtained by a search or seizure, a defendant must first demonstrate that he has standing." State v. Bruns, 172 N.J. 40, 46 (2002). At the outset of a suppression motion, therefore, a court must "inquire whether [the] defendant has interests that are substantial enough to qualify him as a person aggrieved by the allegedly unlawful search and seizure." Ibid. Put succinctly, "Fourth Amendment rights cannot be vicariously asserted." Id. at 48. A motion to suppress "may be successfully brought only by those persons whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of the incriminating evidence obtained in the search." State v. Alston, 88 N.J. 211, 220 (1981).

"Our longstanding jurisprudence accords a defendant automatic standing to move to suppress evidence derived from a claimed unreasonable search or

seizure 'if he has a proprietary, possessory or participatory interest in either the place searched or the property seized.'" State v. Baum, 199 N.J. 407, 422 (2009) (quoting Alston, 88 N.J. at 228). Thus, while defendant may move to suppress evidence, he must "demonstrate an interest sufficient to give him standing." Bruns, 172 N.J. at 56. A "participatory interest" is a broader concept than a "proprietary" or "possessory" interest. State v. Mollica, 114 N.J. 329, 339 (1989). A participatory interest "stresses the relationship of the evidence to the underlying criminal activity and [the] defendant's own criminal role in the generation and use of such evidence." Ibid. However, "evidence implicat[ing] a defendant in a crime is not, in and of itself, sufficient to confer standing" via a "participatory interest." Bruns, 172 N.J. at 58. If it was, "every defendant could conceivably assert rights untethered to the Fourth Amendment or Article I, Paragraph 7 of our Constitution." State v. Armstrong, 463 N.J. Super. 579, 596-97 (App. Div. 2020).

### i. Vehicle Search

Defendant contends because he was charged with selling the CDS that caused Cullens's death, he had standing based on his "participatory interest" to challenge the seizure of the CDS evidence found in Cullens's vehicle. He posits

that because Cullens had not yet died, the search was "a direct result of [defendant's] alleged crime, which was still ongoing."

On December 10, 2020, in its written statement of reasons denying the suppression motions, the court addressed defendant's standing. The court correctly found there was "no indication" defendant and Cullens "were involved in some continuing ongoing criminal enterprise" at the time Cullens's car was searched. The court also found defendant could not "lawfully claim a proprietary, possessory or participatory interest from a drug deal where[,] by the time law enforcement arrived, he was nowhere to be found."

We similarly conclude defendant did not have a "participatory interest" in Cullens's vehicle at the time Doyle searched it. See Alston, 88 N.J. at 228. Defendant no longer possessed the packet of CDS found because he had relinquished it upon the sale to Cullens, he was not at the scene, and the search was not directed against him. When the search was conducted, Doyle had no knowledge of defendant's potential involvement. He was focused on Cullens's medical emergency, not criminality. Defendant's relationship to the evidence found in the vehicle became "far too attenuated to support a constitutional right to object to the search and seizure." Bruns, 172 N.J. at 56. We discern no error in the court's decision.

Although it is unnecessary to reach defendant's privacy interest argument, we only add that defendant had no reasonable expectation of privacy in Cullens's vehicle because he had "no legal interest" in the place searched. See State v. Linton, 356 N.J. Super. 255, 256 (App. Div. 2002). Further, if defendant had a privacy interest, the search of the vehicle was permitted under the emergency-aid exception to the warrant requirement because Doyle reasonably sought Cullens's identification and information to aid in his medical state. See State v. Reece, 222 N.J. 154, 168-69 (2015) (recognizing a warrantless search is justified where "1) the officer had an objectively reasonable basis to believe that an emergency require[d]" immediate assistance and "2) there was a 'reasonable nexus between the emergency and the area . . . to be searched'" (quoting State v. Edmonds, 211 N.J. 117, 132 (2012))). The court's denial of defendant's challenge to the search of the vehicle which yielded the CDS packet is amply supported.

## ii. Cell Phone

Defendant similarly argues the court erroneously denied the suppression of the retrieved phone calls and text messages because he had a "participatory interest" in the "underlying criminal activity—drug distribution—that generated" the evidence. This argument also lacks merit.

19

The court found defendant did not have a "reasonable expectation of privacy" in the text messages found on Cullens's phone or in the call records. We agree. The court noted that although the calls and messages could be used as evidence against defendant, that did not confer standing upon him. Relying on Armstrong, the court found that "once someone sends an electronic message, that person loses any ability to control what happens with that information or data once it is in the hands of someone other than a cellphone service provider." Defendant did not have standing to challenge the warrantless search and seizure of information from Cullens's phone because the detectives retrieved phone information from concluded criminal transactions. Cullens had no further interaction with defendant after the final CDS purchase. Defendant lacked standing regarding the phone records because "[a]n individual ordinarily surrenders a reasonable expectation of privacy to information revealed to a third-party." State v. Evers, 175 N.J. 355, 369 (2003). In Armstrong, 463 N.J. Super. at 591, we found the defendant had no reasonable expectation of privacy in threatening text messages sent to his ex-girlfriend once received.

Once completed, defendant had no reasonable expectation of privacy in the text messages or phone calls with Cullens. Cullens's phone was in his possession and then given to the police by his parents as Cullens was in a non-

responsive state.  Notably, defendant did not own or personally use the phone, and there was no ongoing criminal activity.  As defendant failed to posit a cognizable interest in Cullens's phone records, we discern no basis to disturb the court's denial of defendant's motions to suppress.

Concluding defendant lacked standing, we need not address his arguments that no warrant requirement exceptions applied to search the phone.

### B. Miranda Waiver

Defendant claims for the first time on appeal that Hann violated his rights by wrongly telling him, "Anything you say cannot be used against you in a court of law."  A review of the record demonstrates defendant's contention that the court erred in admitting his statement to police is without merit.

The Fifth Amendment to the United States Constitution guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  New Jersey similarly guarantees the right against self-incrimination.  N.J.R.E. 503; State v. S.S., 229 N.J. 360, 381-82 (2017).  This right exists to combat the inherent pressures of custodial interrogation, "which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  Miranda, 384 U.S. at 467.  Incriminating statements elicited during a custodial interrogation may not be

admitted into evidence unless defendants have been advised of their constitutional rights.  Id. at 492; Hubbard, 222 N.J. at 265.

At the Miranda hearing, Hann testified she went over each of defendant's rights, which he acknowledged by signing a Miranda warnings card.  The video interview was played at the hearing.  Defendant's argument that Hann incorrectly advised him that his statements "cannot be used against" him appears to be based on a typographical error in the Miranda hearing transcript.

We reviewed the video of defendant's statement, and conclude Hann correctly told defendant his words "can be used against" him.  (Emphasis added).  Hann's verbal warning was without the word not.  The transcripts of defendant's statement provided by the State and the transcription of the video statement played at trial also indicate Hann accurately stated the Miranda warnings.  Further, the record establishes defendant acknowledged he understood his rights by signing and initialing the standard Miranda waiver card.  During the interview with Hann, he never invoked his right to remain silent.  Notably, defendant did not raise the alleged misstatement as an issue at the Miranda hearing, suggesting that there was no such misstep by Hann.  See State v. Matinez-Mejia, 477 N.J. Super. 325, 334 (App. Div. 2023) ("Where there is a failure to object, reviewing courts presume the newly minted objection on

appeal is 'not error' and 'unlikely to prejudice the defendant's case.'" (quoting State v. Singleton, 211 N.J. 157, 182 (2012))).

We therefore reject defendant's argument that Hann violated his Miranda rights. As the court correctly found, a review of the recorded statement and an examination of "the totality of the circumstances" demonstrates defendant's statement was voluntary and "the waiver of rights was the product of a free will." See State v. Nyhammer, 197 N.J. 383, 402 (2009).

## C. Admission of Evidence

Defendant contends the court wrongly permitted Piersanti's testimony regarding defendant's prior drug distributions and Cullens's June 17 drug overdose, which was compounded by the failure to give a limiting jury instruction. Defendant further argues the admission of his "prior convictions and prior incarcerations" was overly prejudicial. Defendant raises these issues for the first time on appeal.

Our Supreme Court, in State v. Cofield, 127 N.J. 328, 338 (1992), elucidated a four-pronged test for the admissibility of evidence under N.J.R.E. 404(b). The Supreme Court stated a court is to consider that: (1) "the evidence of the other crime must be relevant to a material issue in dispute"; (2) "it must be similar in kind and reasonably close in time to the offense charged"; (3) "the

evidence must be clear and convincing"; and (4) "the evidence's probative value must not be outweighed by its apparent prejudice." Ibid. When analyzing the fourth prong, a court must consider the evidence's weight and potential for prejudice within its specific context. State v. Castagna, 400 N.J. Super. 164, 175 (App. Div. 2008). N.J.R.E. 404(b) evidence, even when it is probative of some fact in issue, is generally considered inherently prejudicial to some degree. State v. Brunson, 132 N.J. 377, 384 (1993). The prejudice inquiry for N.J.R.E. 404(b) evidence is "more searching" than that required for evidence generally under N.J.R.E. 403, and "the potential for undue prejudice need only outweigh probative value to warrant exclusion." State v. Reddish, 181 N.J. 553, 608 (2004).

Defendant contends it was "improper" under N.J.R.E 404(b) for Piersanti to testify regarding his prior CDS purchases and Cullens's first purchase from defendant. When asked where he and Cullens went on June 17, Piersanti responded, "Well, I had contacted B Rup because . . . he was my main guy, you know, very reliable and stuff," which improperly implied he had previously bought drugs from defendant. Defense counsel did not object.

Although Piersanti's testimony was inadmissible evidence of a prior bad act, we conclude the trial court's failure to strike the testimony on its own

initiative does not rise to the level of plain error requiring reversal of defendant's convictions. The testimony, while offered to explain why he directed Cullens to defendant, was confined to a single comment that permitted an inference of prior drug distributions. We discern this unobjected-to statement was not "clearly capable of producing an unjust result." See R. 2:10-2.

Defendant argues Piersanti's detailed description of Cullens's overdose at the Dollar Tree was "even more prejudicial and even less relevant." Contrary to defendant's contention that Piersanti's testimony violated N.J.R.E. 404(b), the testimony directly related to defendant's charges and thus was not prior bad act evidence. It was relevant to the issues of Cullens's cause of death and whether defendant sold the specific drugs that caused his death. Presented with Piersanti's testimony, the jury could have found Cullens's death was caused by the CDS defendant sold to Cullens on either June 17 or June 18. This unobjected to testimony constituted intrinsic evidence to the charges and the overdose testimony did not suggest defendant had a propensity to deal CDS. We discern no plain error.

Defendant also argues the court wrongly permitted the jury to hear about his multiple prior convictions. Under N.J.R.E. 609(a)(1), "[f]or the purpose of attacking the credibility of any witness, the witness's conviction of a crime,

25

subject to [Rule] 403, shall be admitted unless excluded by the court" as remote or for other causes. Where the witness has a criminal history, and the prior conviction is "the same or similar to one of the offenses charged" or "the court determines that admitting the nature of the offense poses a risk of undue prejudice," the State may only introduce the degree of the offense, date of conviction, and the sentence imposed. N.J.R.E. 609(a)(2)(B). This "sanitization" is intended to "insure that a prior offender does not appear to the jury as a citizen of unassailable veracity" while also "protect[ing] a defendant against the risk of impermissible use by the jury of prior-conviction evidence." Brunson, 132 N.J. at 391. Evidence of prior convictions must also be accompanied by an instruction wherein the trial court explains "carefully to the jury the limited purpose" of that evidence to impeach the defendant's credibility. Id. at 385.

After addressing the convictions with counsel, the court permitted the State to introduce evidence of defendant's prior convictions to impeach his credibility. The convictions were introduced in the properly sanitized form as described in N.J.R.E. 609, with defendant confirming the accuracy of the information. The court correctly instructed the jurors with the model jury charge concerning how the jurors could consider defendant's prior convictions. The

court instructed the jurors that defendant's convictions could "only be used [to] determine[e] the credibility or believability of [his] testimony," and not his commission of the charged crimes. It explained a jury could "consider whether a person who has previously failed to comply with society's rules . . . would be more likely to ignore the oath requiring truthfulness on the witness stand." However, it reiterated that the prior convictions could only be used to evaluate credibility, alongside "all the other factors" discussed in the court's previous instruction concerning witness credibility generally. See Model Jury Charges (Criminal), "Credibility–Prior Conviction of a Defendant" (rev. Feb. 24, 2003). We discern no plain error in the admission of defendant's convictions and the jury charge provided.

Defendant further argues the court wrongly responded to the jury's question regarding his most recent incarceration before Cullens's death because the jury was provided his release date without an appropriate instruction. While deliberating, the jury sent a question requesting the "date of [defendant's] most recent incarceration before the overdose of [Cullens]." During trial, the jury had been told defendant was sentenced to 364 days' imprisonment for a third-degree offense starting on January 20, 2017. Had he served the full sentence, he would have been incarcerated in June 2017 when he allegedly sold CDS to Cullens.

After reviewing the question and hearing argument, the court was convinced it was necessary to provide defendant's release date in addition to the conviction date to ensure there was no jury confusion. Responding to the jury, the court stated, the "date of [defendant's] most recent incarceration . . . would have been January 20, 2017. And [defendant] was released on that charge on May 29, 2017." We discern no plain error in the court's response.

When a jury has a question during deliberations requesting information on an issue, "a trial judge 'is obligated to clear the confusion.'" State v. Berry, 254 N.J. 129, 145-46 (2023) (quoting State v. Savage, 172 N.J. 374, 394 (2002)). The court's assessment of the necessity to clarify whether defendant was incarcerated at the time of the alleged offense was reasonable. The court simply stated defendant's most recent conviction and release date without further comment. We observe the jury asked no further questions regarding the conviction. The court's response to the jury's question did not have the capacity to bring about an unjust result. See R. 2:10-2.

Defendant also argues the jury was wrongly told he "was incarcerated at the time of the alleged" witness tampering without an appropriate instruction. We are unpersuaded. Our Supreme Court has determined that evidence "intrinsic to the charged crime" is not subject to an N.J.R.E. 404(b) analysis

28

"because it is not 'evidence of other crimes, wrongs, or acts.'" State v. Rose, 206 N.J. 141, 177-78 (2011) (quoting N.J.R.E. 404(b)). Evidence is considered intrinsic "if it 'directly proves'" the crime charged or consists of uncharged acts performed contemporaneously with and facilitating the commission of that crime. Id. at 180 (quoting United States v. Green, 617 F.3d 233, 248 (3d Cir. 2010)).

Here, the fact that defendant was in jail was intrinsic background information relevant to describing how defendant used the computer and USB drive in the jail to create the alleged witness tampering document. Further, the information provided context regarding how the corrections officers discovered and intercepted the document. There was no way to excise the incarceration evidence relative to the tampering charge. Thus, there was no alternative, "less prejudicial evidence" to be presented to the jury. See State v. Barden, 195 N.J. 375, 392 (2008). Before Hernandez's testimony, with defense counsel's assent, the court instructed the jury not to use the testimony that defendant was incarcerated "as evidence that . . . defendant [wa]s guilty of any other crimes alleged in the indictment." No further limiting instruction regarding how the witness tampering evidence was obtained during defendant's incarceration was necessary.

## D. Lay Opinion Testimony

Defendant posits the court committed reversible error by permitting improper lay opinion testimony. Piersanti stated that he believed Cullens was lying when requesting defendant's phone number, and Ptaszenski stated that he found defendant's document retrieved from the jail's USB drive "concerning." We are unpersuaded.

Under N.J.R.E. 701, a lay witness may testify "in the form of opinions or inferences" if that testimony "is rationally based on the witness's perception," and "will assist in understanding the witness's testimony or determining a fact in issue." This rule sets forth "narrow bounds" for lay opinion testimony. State v. McLean, 205 N.J. 438, 456 (2011). Lay opinion testimony may not be used as "a vehicle for offering the view of the witness about a series of facts that the jury can evaluate for itself or an opportunity to express a view on guilt or innocence." Id. at 462.

Piersanti testified that Cullens texted and called him on June 18 asking for defendant's phone number for a friend seeking drugs, but he believed Cullens was lying. On cross-examination, Piersanti stated, "I knew deep down that he wanted it because he was trying to get that heroin again. But he assured me that it wasn't for that reason." Defense counsel sought to impeach Piersanti's

testimony with his previous statement acknowledging Cullens never stated he wanted to buy CDS. Further, Piersanti explained he ultimately provided defendant's number because he became "absolutely" convinced his friend wanted it for someone else to buy meth and wrongly "put faith in him." A review of the record yields that the court's failure to strike the unobjected to testimony did not amount to plain error because the testimony was not clearly capable of bringing about an unjust result. R. 2:10-2.

We further discern no error in the admission of Ptaszenski's testimony that the document defendant created, which was retrieved from the jail USB drive, was "concerning." The testimony was provided in the context of explaining how the document was discovered, retrieved, and investigated. Ptaszenski did not opine regarding the document's contents, defendant's intentions, or whether it constituted "witness tampering."

### E. Improper Jury Charges

For the first time on appeal, defendant argues the court's instructions on the CDS charges: were confusing; "created the unacceptable risk of a non-unanimous verdict"; and wrongly charged the jury regarding the sale to Cullens of State's exhibit S-12, the empty packet containing traces of CDS, on two separate dates.

The verdict sheet questions did not mention S-12 but instead referenced "a [CDS]" for each of the six CDS charges along with the corresponding dates. We note that the court reviewed the verdict sheet with counsel and stated it had "added dates to each of the counts of the indictment for clarity and completion sake." Further, defendant did not object to the verdict sheet.

The court advised the jury that its verdict "must represent the considered judgment of each juror and must be unanimous as to each charge." It explained multiple times that this meant "all of the deliberating jurors must agree if the defendant is guilty or not guilty on each charge," reiterating that the verdict on each charge "must be unanimous." The court reiterated, "[e]ach of the twelve members of the deliberating jury must agree as to the verdict." During deliberations, when the jury asked the court, "when filling out the verdict form do we write the number of jurors for guilty or not guilty or do we just put a mark or an X," the court again advised the verdict must be unanimous.

Defendant was charged in separate counts with possessing and distributing CDS on two different days. In other words, the charges asked the jury to decide whether defendant possessed and sold drugs on June 17, and also whether he possessed and sold drugs on June 18. Here, it is undisputed that the State's theory was that defendant sold CDS to Cullens on both dates. The State

32

never specified the date on which S-12 was sold, and the sale of S-12 was not a required element of the offenses.

Defendant argues the jury "was explicitly told that each of the offenses in counts two through seven related to [one] packet of drugs he possessed 'on or about' June 17 and 18." Defendant, however, did not object to the jury charge at the charge conference, when it was read to the jury, or after deliberations began. We can fairly surmise defendant strategically did not object, believing the jury would find he only possessed and distributed S-12 on one date and acquit him of the offenses related to the other day. When a defendant does not object at trial to a jury instruction, that instruction is reviewed on appeal for plain error. State v. Cole, 229 N.J. 430, 455 (2017); R. 1:7-2. Defendant must demonstrate the legal impropriety of the charge that is "sufficiently grievous" to convince this court that "the error possessed a clear capacity to bring about an unjust result." State v. Hock, 54 N.J. 526, 538 (1969). While the court's jury instructions mistakenly mentioned S-12 without further explanation, it did not rise to plain error. R. 2:10-2.

Further, defendant's argument that he was wrongly convicted of the same offense multiple times is misplaced. The rule against "multiplicity" prevents a defendant from "being improperly convicted of multiple crimes, when [the

defendant] only committed one crime." State v. Hill-White, 456 N.J. Super. 1, 12 (App. Div. 2018). Further, "a defendant may not be tried for two identical criminal offenses in two separate counts based upon the same conduct." State v. Salter, 425 N.J. Super. 504, 515-16 (App. Div. 2012). Here, as previously stated, it is undisputed defendant was charged for separate criminal acts, and the State maintained its theory throughout that defendant possessed and distributed CDS to Cullens on two separate dates. Although the trial court misstated the reference to S-12 when instructing the jury on all of the CDS charges, we find that it was not clearly capable of bringing about an unjust result because there was sufficient evidence in the record to sustain each count unanimously.

## F. Request for New Counsel

Pretrial, the court denied defendant's request for assignment of new counsel. Defendant argues reversal is required as he demonstrated good cause for the appointment of new counsel based on the "ongoing and palpable" "conflict" with his attorney and the failure to be provided "loyal and good faith representation."

Defendant asserts the court failed to sufficiently inquire into his request. In a letter dated January 12, 2021, defendant requested the court appoint new counsel. On February 8, defendant addressed his dissatisfaction with counsel at

a hearing and the court noted defendant's "ongoing concern about his representation and the effectiveness of it" stemming from disagreements with counsel.  The court, however, denied the request, reasoning that there was a great deal of motion practice occurring that had delayed the trial for an extended period of time and that getting "another attorney . . . up to speed" would result in further delays.  The court also noted that defendant's complaints about counsel appeared to be simple "disagreements" that "[did] not mean that [he was] not receiving competent counsel."

On May 4, the court again addressed defendant's continued request for new counsel, stating "there [had] been some notable disagreements between" defendant and his attorney with "ongoing discussions about whether or not [defendant] want[ed] to represent himself."  The court noted "delays" in the pretrial proceedings which "could be a function of the attorney[-]client relationship," but found the primary cause was defendant's attempts to file his own motions and "ongoing requests for discovery" already provided.  The court had previously found in response to defendant's complaints about counsel's handling of pretrial motions that the motions and briefs were organized, "perfectly fine," and, contrary to defendant's assertion, cited "a lot of New Jersey cases."  It declined to reconsider defendant's request.

The United States Supreme Court has held that an element of the Sixth Amendment right to counsel "is the right of a defendant who does not require appointed counsel to choose who will represent him." United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006). This right to counsel of choice "does not extend to defendants who require counsel to be appointed for them." Id. at 151. The right to counsel under the New Jersey Constitution has "never been extended beyond the federal guarantee in this regard." State v. Miller, 216 N.J. 40, 63 (2013). Thus, "[t]he Office of the Public Defender retains the flexibility" to choose what attorney will represent an indigent defendant. State v. Kates, 426 N.J. Super. 32, 43 (App. Div. 2012).

We conclude the court's denial of defendant's request for the appointment of new counsel was not an abuse of discretion. The court retained wide discretion in deciding the motion for substituted counsel and was permitted to consider the trial schedule and the State's interest in proceeding in a timely manner. See id. at 45. The court further found defense counsel vigorously argued defendant's pretrial motions. The court's finding that defendant's criticisms were disagreements about strategy or "unsupported claims," which did demonstrate good cause is substantiated by the record. See State v. Rinaldi,

58 N.J. Super. 209, 214 (App. Div. 1959). The record further supports the court's findings of sufficient representation.

Defendant's contention that counsel refused to hire experts is also contradicted by the proffered experts on cellphone forensics and CDS. Defendant's argument that the court did not sufficiently address his "reasons for wanting a different lawyer" is unavailing. The record reflects that the court addressed defendant's ongoing concerns across multiple pretrial hearings. We therefore discern no error in the court's decision not to replace counsel.

### G. Cumulative Error

We reject defendant's argument that cumulative errors warrant reversal. The cumulative error doctrine provides that even where each established error may not individually warrant reversal on its own, a new trial must be granted if, "in their aggregate," multiple errors are of "such magnitude as to prejudice the defendant's rights" or deprive the defendant of due process. State v. Orecchio, 16 N.J. 125, 129 (1954). Although each established error may not individually warrant reversal, a court may find that the errors collectively deprived the defendant of due process. Id. at 134. Nevertheless, even where a defendant alleges multiple errors, "the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair." State v. Weaver, 219 N.J. 131,

155 (2014).  Defendant received a fair trial, as we have discerned any trial errors were not clearly capable of causing of an unjust outcome.  See id. at 155; State v. Rambo, 401 N.J. Super. 506, 527 (App. Div. 2008).

## H. Sentencing

Defendant argues the court failed to consider his substance abuse disorder when evaluating the aggravating and mitigating factors during sentencing. Defendant also argues the court failed to analyze the factors outlined in State v. Yarbough, 100 N.J. 627 (1985) regarding the overall fairness of the consecutive sentences.  Specifically, defendant avers the court failed to consider and make findings on the fairness of a consecutive sentence for the June 17 CDS distribution conviction.

Applying an abuse of discretion standard, we maintain a limited scope of review when considering sentencing determinations on appeal.  See State v. Torres, 246 N.J. 246, 272 (2021).  We do "not second-guess the sentencing court" and defer to the court's factual findings.  State v. Case, 220 N.J. 49, 65 (2014).  A sentence, therefore, must be affirmed "unless:  (1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial

conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364−65 (1984)).  In imposing a sentence, the court must make individualized assessments based on the facts of each case and "state reasons for imposing such sentence including . . . the factual basis supporting a finding of particular aggravating or mitigating factors affecting [the] sentence."  R. 3:21-4(h); see also N.J.S.A. 2C:43-2(e).

The record demonstrates the court heard defense counsel's extensive argument regarding defendant's history as "a drug addict" and an explanation that he "was not provided with rehabilitative services that would [have] allow[ed] him to end this cycle of addiction and criminality."  The court also listened at length to defendant's account of his addiction and inquired  into his lack of success in rehabilitation programs and treatment.  Unpersuaded, while finding there were no mitigating factors given defendant's history of "drug case type of convictions," the court found that aggravating factors three, six, and nine applied.  We discern no abuse of discretion in the court's consideration of defendant's substance abuse disorder, as its findings are supported by credible evidence in the record.

Defendant correctly argues the court failed to explain and "justify the imposition of a consecutive sentence for [the] drug distribution" charge on June

17, 2017. When sentencing a defendant for multiple offenses, "such multiple sentences shall run concurrently or consecutively as the court determines at the time of sentence." N.J.S.A. 2C:44-5(a). In Yarbough, 100 N.J. at 642-44, our Supreme Court established criteria that a sentencing court must consider when deciding whether to impose consecutive sentences. "The Yarbough factors are qualitative, not quantitative; applying them involves more than merely counting the factors favoring each alternative outcome." State v. Cuff, 239 N.J. 321, 348 (2019).

A court's explanation of its reasoning regarding the factors is "invaluable to support the choice to impose a consecutive sentence, which will often increase the real time a defendant spends in custody as much as a decision to impose a sentence at the top of the sentencing range for an individual offense among several being imposed." Torres, 246 N.J. at 271. Indeed, an explanation of the overall fairness of the sentence is necessary "to 'foster[] consistency in . . . sentencing in that arbitrary or irrational sentencing can be curtailed and, if necessary, corrected through appellate review.'" Id. at 272 (alteration in original) (quoting State v. Pierce, 188 N.J. 155, 166–67 (2006)). While the factual background in Torres did not involve mandatory presumptive consecutive sentences and we have not construed it to require a sentencing court

to consider the overall fairness of mandatory consecutive sentences, the court is required to explain the overall fairness of discretionary consecutive sentences ordered.

Here, the court failed to discuss the Yarbough factors and only stated that the convictions for the June 17 drug distribution in count seven and witness tampering in count eight would be run consecutive to the sentence for drug-induced death and each other. We find it was not required to provide an explanation for the consecutive sentence for count eight, because N.J.S.A. 2C:28-5(e) mandates such a sentence for witness tampering. However, the court was required to address the Yarbough factors and the overall fairness of a consecutive sentence for count seven. As the analysis is absent, no "proper record for appellate review of the sentencing court's exercise of discretion" is provided. Torres, 246 N.J. at 272. Thus, remand is necessary for the court to sufficiently explain why the consecutive sentences are warranted. State v. Miller, 205 N.J. 109, 129-30 (2011); State v. Carey, 168 N.J. 413, 424 (2001).

I. Motions to Acquit and For a New Trial

Defendant contends in his self-represented submission that the court erred in denying his motions for acquittal and a new trial, arguing there was insufficient evidence to convict him of the charges. Specifically, defendant

posits: (1) no witnesses testified that they saw him possess or distribute CDS to Cullens on June 18, 2017; (2) there was no cell tower evidence confirming Cullens and Piersanti visited him on June 17, 2017; (3) Cullens told Piersanti he wanted meth, not heroin; (4) Cullens could have obtained heroin from someone else; and (5) since there was no autopsy, there is "no way to determine" whether heroin, and not the other pills found in Cullens's wallet, caused Cullens's death.

In assessing the sufficiency of the evidence on an acquittal motion, we apply a de novo standard of review. State v. Cruz-Pena, 243 N.J. 342, 348 (2020). At the close of the State's case or after all evidence has been presented, the court shall "order the entry of a judgment of acquittal of one or more offenses charged . . . if the evidence is insufficient to warrant a conviction." R. 3:18-1. Further, if the jury returns a guilty verdict upon defendant's motion, the court "may set aside a verdict of guilty and order the entry of a judgment of acquittal." R. 3:18-2. We "must determine whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." State v. Williams, 218 N.J. 576, 594 (2014).

The court denied defendant's motion for acquittal after the State's case. While noting the case was "largely circumstantial," it found that "all of the

42

testimony that's been brought forward," including "the cause of death," "the cell site information placing [Cullens] and [defendant] in the same area," the "visual evidence from the [Wawa] video," and "the totality of the circumstances," demonstrated the State had "more than satisfie[d]" its burden of proof. We agree. A review of all the trial evidence amply demonstrates a reasonable jury could find guilt beyond a reasonable doubt.

On October 25, 2021, the court denied defendant's motion for a new trial. In its oral statement of reasons, the court correctly observed its obligation to review whether clear and convincing evidence demonstrated "a manifest denial of justice under the law." It found that there was nothing to suggest that "the jury did anything other than their job and rendered the verdict accordingly." We again agree and find that defendant has failed to demonstrate by clear and convincing evidence that the verdict was "against the weight of the evidence" and there was a "manifest denial of justice under the law." R. 3:20-1.

### J. Barring of Defense Expert

Lastly, defendant argues the court wrongly granted the State's motion to bar his CDS expert's testimony. Specifically, he argues his expert was qualified to testify regarding: the CDS "transactions and preparation of the syringe for which Mr. Cullens overdosed," the failure to perform an autopsy, and the failure

to test the triangular pills found in Cullens's vehicle as a cause of the overdose. He asserts the proffered expert was recognized as an expert in the packaging and the transfer of narcotics but posits the expert should have also been permitted to expand on his report and provide opinions on potential defects in the investigation.

We review a trial court's evidentiary determinations regarding an expert witness's qualification for abuse of discretion and reverse only "for manifest error and injustice." State v. Rosales, 202 N.J. 549, 562-63 (2010). N.J.R.E. 702 provides that "a witness qualified as an expert by knowledge, skill, experience, training, or education" may testify on a subject "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." In considering the admission of an expert's opinion under the net opinion rule, the court must determine if the expert has provided "the why and wherefore of his or her opinion, rather than a mere conclusion." State v. Townsend, 186 N.J. 473, 494 (2006).

Defendant's CDS expert primarily opined on the police investigation and concluded, "to a reasonable degree of professional certainty, and based on the totality of circumstances, . . . there are other plausible explanations and

collateral issues that affect this case, beyond whether [defendant] had supplied the heroin." The court correctly found the opinion was a net opinion. The court barred the expert's report and testimony because it was outside of his specialized expertise and was based on "his assessment of the investigation" and speculation. The court allowed defendant to obtain a new report from the expert "within his field of expertise about . . . methods, usage, jargon, and all of the different kinds of things that go into . . . drug distribution." No further expert report was obtained.

The decision to bar the expert's proffered opinions is sufficiently supported by the record, was "within the sound exercise of discretion by the trial court," State v. Berry, 140 N.J. 280, 293 (1995), and is "entitled to deference on appellate review," Townsend v. Pierre, 221 N.J. 36, 52 (2015). We discern no abuse of discretion in the court's finding that the expert "expressed a view on a . . . subject that was beyond his area of expertise." State v. Odom, 116 N.J. 65, 76 (1989).

Defendant's remaining arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed in part and remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1122-21